[Sac. No. 2797. In Bank.—December 7, 1920.]

## YUBA INVESTMENT COMPANY (a Corporation), Respondent, v. YUBA CONSOLIDATED GOLD FIELDS (a Corporation), Appellant.

[1] DEED—QUITCLAIM TO UNITED STATES OF MINERAL LAND—AID OF NAVIGATION—CONSTRUCTION OF CONVEYANCE—GRANT OF FEE.—A quitclaim deed of land in the bed and on the banks of a tributary to a navigable river, made to the United States government to preserve the navigability of the river, conveyed the fee, and not an easement, notwithstanding the reservation of mining rights, and of the use and occupation of the land not inconsistent with the use of the grantee, where the conveyance was sufficient in form, both in the granting and *habendum* clauses, to convey the fee, and contained no limitation as to the character of the use by the government, but, on the contrary, expressly provided that the land might be used for any and all purposes.

[2] ID.—EXECUTION OF DEED — SURROUNDING CIRCUMSTANCES — EVIDENCE—WHEN INADMISSIBLE.—Where the proper construction of a deed is plain on its face, declarations during the negotiations concerning the purpose of the deed and the rights of the parties with reference to the use of the property cannot be considered for the purpose of modifying or changing the terms of the document itself.

[3] ID.—PURPOSE OF DEED — SURROUNDING CIRCUMSTANCES — WHEN IMMATERIAL.—Even though it be apparent from the negotiations and surrounding circumstances leading up to the execution of a deed of land to the government that the purpose was to construct reclamation works and to use a portion of the land as a settling basin, such fact would have no greater effect than a declaration to the same effect in the deed, and such an express declaration would not convert a deed whose terms otherwise conveyed a fee into one conveying a mere easement for such use.

[4] ID.—RIGHT TO EXTRACT MINERALS.—Where a quitclaim deed to the United States of certain land for the construction of reclamation works and a settling basin reserved and excepted all precious metals, but contained no express reservation of the right to extract them, the grantee of such reserved right nevertheless had the right to extract such metals, even though the effect would be to wholly destroy the surface of the land, in view of the principle that the right to precious metals implies the right to mine them and of the statutory rule that reservations and exceptions

Oral proof as supplementing deed, note, 2 Ann. Cas. 148.

are to be construed in favor of the grantor, and of the express reservation in the deed of the right to use the premises in any manner not inconsistent with the use of the government.

[5] ID.—DEPOSIT OF DETRITUS FROM MINING OPERATIONS.—Where land conveyed to the government in fee for reclamation purposes in aid of navigation was in turn conveyed by the government to a gold dredging corporation, the right of such corporation to deposit detritus on another tract of land to which another company had succeeded to the mineral rights of the original grantor was limited to what was reasonably necessary to enable it to conduct its dredge mining operations on its own tract.

[6] ID.—RESERVED RIGHT OF POSSESSION — RECOVERY FOR USE AND OCCUPATION — DEMAND.—Where a deed of land to the United States for reclamation purposes in aid of navigation reserved the use and possession in so far as the same might not interfere with the use and possession of the United States, the grantee of the United States can recover for the value of the use and occupation of the land from the original grantor or his successor only in case that demand for possession was made upon him or such successor, and then only for the period subsequent to such demand.

APPEAL from a judgment of the Superior Court of Yuba County.    Eugene P. McDaniel, Judge.    Reversed.

The facts are stated in the opinion of the court.

Charles W. Slack, W. H. Carlin, A. F. Jones and Thos. H. Breeze for Appellant.

Sullivan & Sullivan and Theo. J. Roche and J. E. Ebert for Respondent.

WILBUR, J.—This is an action to quiet title.    Plaintiff recovered judgment and defendant appeals.    Both parties claim under James O'Brien, who on December 6, 1901, made a quitclaim deed of the property to the United States of America, containing certain agreements, reservations, and exceptions. The interpretation of this deed forms the basis of this controversy.    The title of the United States was conveyed to the defendant October 30, 1911.    Whatever interest in the property remained in the grantor, except as noted near the end of this opinion, was conveyed to the plaintiff.    The plaintiff contends, and the trial court held, that the deed to the government merely conveyed an easement; that this easement

was abandoned by the government, and, consequently, its subsequent conveyance to the defendant was of no effect. The defendant on the other hand, claims that the deed of O'Brien conveyed the fee to the government and that the proper decision of the case turns on the nature and extent of the rights reserved to O'Brien and conveyed by him to the plaintiff. The pivotal question in the case is whether or not the government acquired a mere easement. Such facts as are necessary to the determination of that preliminary question will now be stated, and later, in considering the other questions involved, such additional facts will be stated as are necessary to an understanding and decision of such points.

At the time of the conveyance O'Brien was the owner of a large amount of land in the bed and on both banks of Yuba River, a tributary to the Sacramento River. Some of this land was known to contain placer gold. The California Debris Commission, in order to preserve the navigability of the Sacramento River, planned to impound the detritus in the Yuba River resulting from mining operations, thus preventing its deposit in the Sacramento River, by constructing certain reclamation works, including dams and levees, to form a settling basin on the land of O'Brien. For that purpose negotiations were entered into with him with a view to acquiring the necessary land and rights for such purposes. The deed in question resulted. It covered not only the parcel of land involved in this suit, but by separate description and different reservations and exceptions certain other large tracts of land. These various parcels of land are separated into three tracts, with different reservations applying to each. These tracts are designated "First," "Second," and "Third." Tract "First," the land in controversy, contains over one thousand acres, and most of it is designated upon a plat attached to and made a part of the deed as "South Basin." Tract "Second" in large part lies between the official banks of the Yuba River. Tract "Third" contains 442 acres, and is bounded on the north by the official left bank of the Yuba River, and on the south by the Linda Levee, and is marked "Dredging Ground" on such plat. This tract is owned by the defendant and is spoken of throughout the brief as the "442 acre tract." The granting clause of the conveyance is the usual quitclaim, stating that the grantor "has remised, released, and forever quitclaimed," etc., to the

United States of America the parcels of land shown upon the attached map and thereinafter more particularly described. The *habendum* clause is in the usual form to the grantee and its successors. The reservations and exceptions relate to the precious metals, the right to extract the same, the deposit of detritus and the use and occupation of the premises.

### The Reservation and Exceptions Concerning Use.

The reservation of the use of tract "First" is as follows: "But reserving and excepting unto said party of the first part, his heirs and assigns . . . the use and possession of such premises in so far as the same may not interfere with the use and possession of the premises by said party of the second part, its authorized agents, employees or contractors, *for any and all purposes* that it or they may see fit to use the same, said use and possession so reserved to be subject to all the rules and regulations and orders of the said party of the second part, its agents and employees."

In tract "Second," which was covered by placer mining claims, the reservation with reference to the use is as follows: "But reserving and excepting unto said party of the first part, his heirs and assigns, the use and possession of said premises in so far as the party of the first part would otherwise be entitled to by virtue of said mining claims." Then follows a proviso similar to that with reference to tract "First" above quoted, to the effect that such use must not interfere with the use and occupation by the government. But it is also stated that: "This reservation shall in nowise be construed as granting, confirming or conceding to the grantor the validity of said mining claims."

There is no specific reservation of the right to use tract "Third," except that there is also reserved "the right to extract precious metals therefrom."

### The Reservation of Precious Metal.

The reservations and exceptions with reference to precious metals are different in the different tracts. In tract "First" the grantor reserves and excepts "all precious metals in or on said premises and the use and possession of said premises," etc. In tract "Second" the grantor merely reserves the right to the use and possession of the same as mining claims. In tract "Third" the grantor reserves and excepts all precious

metals in or on said premises, *with the right to extract the same.*

There is nothing in the granting clause of the deed which in anywise limits the title conveyed, nor do the reservations or exceptions expressly limit it. No right reserved is at all inconsistent with the grant of a fee in tract "First," except the right to the use and occupation of the premises which, according to the terms of the reservations and exceptions, is at all times subject to the grantee's use for any and all purposes for which it may see fit to use the same. If in the reservation of the right to the use and occupation of the premises such right was merely subordinate to the use of the same premises by the government *as a settling basin* or for works erected for the purpose of impounding detritus in the Yuba River, the argument that the deed merely conveyed an easement to the government for that purpose would be much stronger. Before finally determining the proper construction of the deed, it remains to be considered whether the other provisions of the deed, and the facts and circumstances relied upon by respondent in connection with the execution of the instrument now to be stated, aid in such determination.

Gold mining in this neighborhood is conducted by dredgers, floating on an artificial pond, which handle all the material from the surface to the bedrock. Tract "Third," designated upon the map as "Dredging Ground," is to be completely surrounded by banks and levees constructed by the grantor. This tract is referred to in the deed as the tract of land *"to which said mining privilege applies,"* and it is provided that the embankments constructed by the grantor surrounding this parcel "shall be sufficiently thick and strong to permit the land *surrounding* the same to be safely used as a *settling basin."* Tract "First," in controversy, it is to be remembered, bounds this dredging ground on the south. It is provided that the embankments and levees around tract "Third," as fast as constructed by the grantor, shall become the property of the grantee, and that the grantor shall construct a drainage cut, and that the grantee "shall have the right of constructing outlets to conduct off-flow from its *proposed settling basin,* both north and south of said premises into the aforesaid drainage cut to be constructed by said party of the first part [the grantors], the right to use which as a drain is hereby conceded to the said party of the second

part [the grantee] free of compensation." These clauses of the deed refer to the mining privilege as applying to tract "Third," and indicate the purpose of the government to use the property north and south thereof as a settling basin. Provisions are made in the deed with reference to the deposit of material from mining operations which will hereafter be more fully discussed, requiring the redeposit of all material on the premises from which they are taken, with the exception of the right to deposit detritus upon tract "First," in quantities which, under certain conditions, may aggregate fourteen million cubic yards.

As further indicating the grantee's intention to use a portion of tract "First" as a settling basin, a right of way was granted across the land of the grantor to the east of tract "Third," "for a canal leading to said south basin from the upper works to be constructed by the said party of the second part along lands on the south side of the Yuba River." Another right of way is granted "to convey water from the southern extremity of said *settling basin south of Linda Levee,* following the natural depression of the land," etc. The deed also provides: "that at any time such portions of said premises as shall have been already worked over, shall be available for use by the United States as a *settling basin* on condition that such use shall not interfere with the mining of the remainder of said premises, and provided further that in any case all of said premises shall be available for use as a settling basin without restriction on and after January 1, 1952."

It is clear, from the deed as an entirety, that in the specific provisions with relation to the mining privilege the parties had in mind the mining operations immediately contemplated upon tract "Third" only. Whether there was an implied right to mine other tracts is a question which requires consideration, but that matter will be taken up later.

[1] On the face of the deed, then, it is clear that the conveyance is sufficient in form, both in the granting and *habendum* clauses, to convey the fee to the government. The reservation of mining rights is not inconsistent with the granting of the fee to the government, nor is the right to the use and possession of the premises, limited as it is by the proviso that such use and occupation must be subject at all times to the wishes of the grantee, inconsistent with the grant

of the fee. It is clear from the deed itself that the government intended to use the premises for the construction of certain reclamation works, and certain of the premises, including a portion of tract "First" as a settling basin. There is, however, no express provision of the deed limiting the use of the government to that purpose, nor any right of reversion to the grantor in the event that the government used the premises for some other purpose, or failed to use it for the purposes mentioned. On the contrary, as already stated, it is expressly provided that the premises may be used by the government for any and all purposes. The government no doubt intended to use a portion of the premises in controversy as and for a settling basin. The whole deed clearly shows this purpose, but the question here is whether, failing to use it for that purpose, the title reverts to the grantor. It is not so stated in the deed, and it is conceded, unless the right of the government was a mere easement, the abandonment of the scheme to use the premises as a settling basin would not destroy the title of the government. When the government ascertained that the south settling basin would not be needed, because the dredging operations carried on by the plaintiff had obviated the necessity for that use, it offered tract "First" for sale and sold the same to the defendant.

The plaintiff insisted upon its right to introduce evidence of circumstances, the surroundings and the negotiations leading up to the execution of the deed, for the purpose of construing it. Such evidence was objected to by the defendant. Its objections were overruled, and in the light of this evidence the court rendered its decree. In considering the admissibility of this testimony and its effect upon the construction of the deed we will for a moment lay aside the conclusion already announced that the proper construction of the deed is plain upon its face, and consider somewhat in detail the evidence by which it is sought to establish the contention that the deed created a mere easement in favor of the government.

### The Circumstances Connected With the Execution of the Deed.

We will first state some of the facts and surrounding circumstances at the time of the execution of the deed, and will then set forth some of the evidence concerning the negotiations. The report of the California Debris Commission stated that its purpose was to impound mining debris to pre-

vent further injury to the navigable waters of the state; that the commission had selected Yuba River as the site for the first works to be constructed, since this river carried more detritus than all the other tributaries of the Sacramento River combined; that in the vicinity of the Narrows there was a natural site for impounding works. Other portions. of the report confirmed the view of the commission that land was to be secured for the purpose of a settling basin to impound the mining detritus. It is clear from the report of the California Debris Commission that the purpose of the commission in securing conveyances from Mr. O'Brien was in furtherance of their declared object of constructing the necessary works to establish a settling basin upon tract "First." It is worthy of note that the report states that the project is novel; that nothing of the kind had theretofore been attempted, and the work was necessarily experimental, but that the various structures contemplated were believed to be safe, practical, and reasonably permanent. It was then stated: "They can be repaired if required, and if abandoned, not maintained, or never completed, cannot leave the river in any worse shape than at present." It was further reported: "Before construction work can be commenced, it is necessary to have, first, formal approval of the project by federal and state authorities; second, acquisition of *title to the land* embraced within the area occupied by the impounding works. . . . The aggregate amount of land required within the area embraced within the existing project is two thousand acres, for which about twenty thousand dollars is believed to be a fair and reasonable compensation." It is to be observed that the report speaks of the acquisition of land and not easements, and a similar reference is contained in another portion of the report.

Negotiations Preceding the Execution of the O'Brien Deed.

Evidence of the negotiations between O'Brien and the agents of the government for the acquisition of his land was introduced, over the objection of the defendant. Without at present passing upon the correctness of this ruling, we will state in general terms the character of that evidence. James K. O'Brien, the son of the grantor, testified that he met Hubert Vischer, assistant engineer of the California Debris Commission, two or three weeks prior to December 6, 1901. Mr. Vischer carried on all the negotiations, during which Mr.

Vischer stated that the ground on section 5 and probably section 4 (parts of tract "First") would be used as a settling basin. "They admitted this land was valuable for farming and might be valuable for dredging. We discussed that it was mineral land and said that in our opinion the amount of money we were to receive for the land was a mere bagatelle as far as the value of the property was concerned. We said that the land could be dredged by operations such as were being carried on in Oroville." The purpose of these operations was to extract the gold. The price was fixed at twenty dollars an acre for tract "First" for farming purposes. The witness testified that "at the hearing of the California Debris Commission the contemplated use of these lands by the government for settling basin purposes was discussed between my father and Mr. Vischer. Reference was especially made to the land in sections 6, 4, 5, and 8 (including tract 'First') for the south settling basin. It was discussed that my father was to retain the mineral in the settling basin." The witness was then asked the following question:

"State the substance of what was said by the commissioner, Mr. Vischer, yourself, and your father at these hearings in addition to what you have already testified to, in regard to the particular purpose for which that land was to be used and to what extent your father would be entitled to the use and possession of the property.

"A. Simply and solely for settling basin purposes in connection with the project of 1899. My father was to have exclusive use of the properties involved in sections 4, 5, 6, and 8, except as far as the government might need it for settling basin purposes. He could put it to any use he desired. *If the project was not carried out he would have the right to dredge* if there was any dredging ground there, and he would have the use of the land for farming or any other purposes it was suitable for."

The witness further testified that it was stated that it might be four or five years before the government would begin to use the land, and that "after the land had been used as a settling basin when it was filled up my father would have an elevated farm there"; that the grantor "was to have the use of it so far as it did not interfere with its use by the government as a settling basin"; that the use and possession of the premises by the grantor would have to be under the

rules and regulations prescribed by the United States government; that *nothing was ever said to the effect that the United States might sell or dispose of these lands at any time;* that "we reserved the mineral in the property. If, for any reason, the project might be amended or the intention to use it as a settling basin should not be carried out, *my father had the right to dredge-mine the property,* which was the only method then and now supposed by which it could be operated"; that the word "easement" was used by members of the commission and Mr. Vischer during the negotiations. "The commission used the word. My father used it, and Mr. Vischer used it—granting of an easement"; that Mr. Vischer dictated a letter to accompany the deed to the United States government, which was dated December 6, 1901, and signed by J. O'Brien, the grantor. This contained the following statement: "Gentlemen: I herewith submit to you a deed conveying easements to certain lands," etc. On April 22, 1902, the letter was acknowledged by the California Debris Commission, by letter, stating: "We hereby notify you that in accordance with your letters of submittal, dated December 4th and 6th, 1901, the United States has accepted two certain deeds," etc. In considering these negotiations it is well to remember that according to the testimony of Mr. O'Brien the only thing said as to the result if the government abandoned its proposed "settling basin" was that the property could then be dredge-mined. Both parties to the transaction evidently fully believed that the government would carry out its plan. The mere characterization by Mr. O'Brien in the letter dictated by Mr. Vischer of the deed as one conveying an easement, is unimportant. **[2]** It is clear that these declarations during the negotiations concerning the purposes of the deeds and the rights of the parties with reference to the use of the property cannot properly be considered for the purpose of modifying or changing the terms of the document itself. It is true that the evidence was ostensibly offered, as such evidence always is in view of the definite statutory rule upon the subject (Civ. Code, sec. 1625) to place the court in the situation of the parties, and thus to enable it to interpret the terms of the deed. **[3]** While it is apparent from the negotiations and surrounding circumstances that the purpose of the government in securing the land was to construct the works in question and to use the particular tract as a settling

basin, this would have no greater effect than a declaration to the same effect in the deed, and such an express declaration would not convert a deed, whose terms otherwise conveyed a fee, into one conveying a mere easement for such use. (*Fitzgerald* v. *County of Modoc,* 164 Cal. 493, [44 L. R. A. (N. S.) 1229, 129 Pac. 794].) It is not claimed that in these negotiations it was agreed that the land would *revert to the grantor* in the event that the property was not used as a settling basin. At most, it was said that his reserved right to use the surface of the land would be valuable for agricultural purposes, and this statement must have been made in the light of the fact that both parties in the discussion assumed that the government would retain the property. The negotiations were not directed to the possibility that the government might sell tract ''First,'' so that in determining the effect of the deed upon the subsequent abandonment of the scheme by the government, so far as this land was concerned, we are given no assistance by any of the negotiations between the parties, even if it were proper to consider them. Indeed, all that was said points to the conclusion that the government was, in any event, to retain some interest in the premises and that the rights of the grantor were to be subject thereto. We conclude, therefore, that the deed conveyed the fee of tract ''First'' to the government, and that the deed from the government to the defendant vested the fee in it.

In view of the necessity of a new trial we will pass to a consideration of the exceptions and reservations in O'Brien's deed to the government. The plaintiff has acquired from O'Brien the reserved and excepted right to the precious metals in said land, and the defendant, through mesne conveyances from O'Brien, has acquired the easement to deposit fourteen million (subsequently decreased to nine million) cubic yards of mining debris thereon. Defendant contends that the right to the precious metals does not include the right to extract them and thus reduce them to possession, where the process of extraction destroys or disturbs the surface, citing in support of this contention the following cases, among others: *Williams* v. *Gibson,* 84 Ala. 228, 231, [5 Am. St. Rep. 368, 4 South. 350]; *Harris* v. *Ryding,* 5 Mees. & W. 60, 68–76; *Hext* v. *Gill,* L. R. 7 Ch. App. 699, 718; *Noonan* v. *Pardee,* 200 Pa. St. 474, 482, [86 Am. St. Rep. 722, 55 L. R. A. 410, 50 Atl. 255]; *Phillips* v. *Collinsville Granite*

*Co.*, 123 Ga. 830, 839, [51 S. E. 666]; *Bibby* v. *Bunch*, 176 Ala. 585, 589, [58 South. 916], and the following text-books: 1 Jones on Real Property, sec. 538, p. 449; 18 Am. & Eng. Ency. of Law, 2d ed., pp. 556, 557. The plaintiff claims that such a right is involved in the exception and reservation of the grant, by necessary implication, and in support of this contention cite the following text-books and cases: Footnote, 48 L. R. A. (N. S.) 884; 27 Cyc. 687, 688; *Williams* v. *Gibson, supra;* 18 Am. & Eng. Ency. of Law, pp. 556, 557. There is no express reservation of the right to *extract* the gold or precious metals in tract "First," although such right was specially reserved and excepted as to tract "Third." In order to understand the claims of the parties it will be necessary to state further facts in relation to the method of carrying on mining operations in the vicinity. Mining is carried on wholly by dredging. All the material from surface to bedrock is moved. In tract "Third" bedrock is sixty feet below the surface. At the time the deed was executed by O'Brien to the government, dredgers of the type used for the recovery of gold were only capable of operating to a depth of forty feet, although they now operate to a depth of from sixty to eighty feet. It was, therefore, then impossible to operate a dredge from the surface to the bedrock on tract "Third." The overload of twenty feet would have to be removed in order that dredgers might successfully operate. It is contended by the plaintiff, and the trial court decided, that the purpose of those provisions of the contract authorizing the deposit on tract "First" of fourteen million cubic yards of material from the mining operations of the grantor was to make provisions for this overload, which aggregated on tract "Third" fourteen million nine hundred thousand cubic yards, and that such right inured to the benefit of tract "Third," which became the dominant estate to which the easement appertained. In this respect we think that the trial court correctly interpreted the deed. We will next consider the right of the plaintiff to remove the precious metals in tract "First."

Dredge mining absolutely destroys the surface and leaves the land from twelve to thirteen feet higher than before the dredging operations were commenced, the upper portions being composed of cobblestones a foot or less in diameter. It follows that if dredging operations of this type were con-

ducted on tract "First," its value for agricultural purposes will be entirely destroyed. If, on the other hand, the reservation and exception of the precious metals in tract "First" did not authorize the grantor to operate a mining dredge in the customary manner and thus destroy the surface, the reservation was of no effect and of no value, for no other method of mining was practicable. In this connection it should be observed that the use of the land so far as not inconsistent with the use by the government was expressly reserved along with the right to the precious minerals therein. That dredge mining is not wholly inconsistent with the use of the land as a settling basin is also clear from the fact that it is expressly provided in another clause of the deed that "worked over" portions of tract "Third" "shall be available for use as a settling basin." [4] The principle that the right to precious metals implies the right to mine the same, fortified by the statutory rule that reservations and exceptions are to be construed in favor of the grantor, and by the express reservation and exception of the right to use the premises, in any manner not inconsistent with the use by the grantee, and by the further fact that the premises could still be used by the grantee as a settling basin if the minerals were extracted with due regard to that use, and that the only known method of extraction in contemplation by the parties was dredge mining, all lead to the conclusion that the plaintiff as grantee of O'Brien mining rights in tract "First" is entitled to extract the precious metals therefrom, even though the effect thereof is to wholly destroy the surface.

Having thus determined that the plaintiff has the right to mine the precious minerals contained in tract "First," and that the defendant has succeeded to the rights of O'Brien to deposit detritus upon tract "First" from the mining operations on tract "Third," it remains to consider the proper relation of these two easements.

It should be stated in this connection that on January 15, 1902, O'Brien conveyed to Evans tract "Third," together with the reserved right to deposit mining detritus on tract "First," and that the conveyance by O'Brien to the plaintiff of all the rights remaining in him was not made until April 10, 1912, ten years after the said conveyance to Evans, and that it did not convey to the plaintiff anything which O'Brien's deed to Evans had conveyed to him. The defendant has

succeeded to the rights of Evans to deposit detritus from tract "Third" on tract "First." If, at the time of the conveyance to Evans, O'Brien had owned tract "First" in fee, undoubtedly Evans' easement appurtenant to tract "Third" and the corresponding servitude on tract "First" would have been superior to O'Brien's fee-simple estate and would carve that much out of said estate. The same result follows with respect to any easement or other interest which O'Brien then had in tract "First." Consequently, the servitude was a burden, and a paramount burden to O'Brien's reserved right to mine the precious metals in tract "First." The subsequent conveyance of that right by O'Brien to plaintiff gave it no greater right than O'Brien then possessed, and there· fore, its mining right in tract "First" is subject to the defendant's right to deposit detritus thereon taken from tract "Third."

[5] As the question as to the exercise of these two rights under the deeds as we have construed their effect is not discussed in the briefs, it is only necessary for us to say that the right of the defendant to deposit detritus upon tract "First" is limited to what is reasonably necessary to enable it to conduct its dredge mining operations upon tract "Third." That the right is further limited by the maximum of nine million cubic yards, and that the deposit of this quantity of detritus or any portion thereof must be done in a manner reasonably required by the mining operations on tract "Third," and in a manner reasonably consistent with the right of the plaintiff to extract the precious minerals from tract "First" by dredge mining operations. Whether the right to deposit the difference between one and a half million cubic yards of detritus and the balance of the nine million cubic yards is dependent upon the conditions expressed in the deed that a levee to the west of the settling basin should be elevated one foot for each additional two and a half million cubic yards of detritus deposited upon the land, is a matter that is not discussed in the briefs, and which, therefore, we will not consider. It is also necessary to pass upon the right to the use and occupation of the premises involved in the cross-complaint. The entire court concurs in the views hereinbefore expressed, but as to the right to the rents and profits, the court is of opinion on that subject, from which I dissent, as follows, to wit:

"The Right of Possession.

"In O'Brien's deed to the United States he reserved to himself 'the use and possession of said premises in so far as the same may not interfere with the use and possession of said premises by [the United States] its authorized agents, employees, or contractors, for any and all purposes that it or they may see fit to use the same, said use and possession so reserved to be subject to all the rules and regulations and orders of [the United States] its agents and employees.' This gave to O'Brien no right upon the premises except when his use or occupation thereof did not interfere with the use or occupation of the United States. The deed contains no statement limiting the purposes for which the United States should use the same. The conveyance being of the fee, it had the right to use the same for all purposes except so far as such use was limited by the reserved servitude in favor of tract 'Third,' above mentioned, now owned by the defendant, and by the other reserved right of 'all precious metals on, or in, said premises,' which, as we have seen, included the right to mine the same by dredging. For any other purpose O'Brien's right to the use had to yield to the demands of the United States.

[6]   "On the other hand, until the United States demanded the use and possession of the property, O'Brien had the right to them and to any profits that might ensue from them. In this condition of affairs, the United States conveyed to the defendant on October 30, 1911, and O'Brien conveyed to the plaintiff on April 10, 1912. O'Brien had remained in the actual possession of the property up to the time of his deed to the plaintiff and then surrendered possession to the latter which has been in possession ever since. So far as appears, no demand for possession was ever made upon O'Brien by the United States or upon O'Brien or the plaintiff by the defendant. The defendant, nevertheless, seeks by cross-complaint to recover from the plaintiff the value of the use and occupation of the property ever since the plaintiff took possession. But this it cannot do except for such period as the plaintiff may have wrongfully been in possession, and until demand for possession was made by the United States or by the defendant as its grantee either upon O'Brien while he was in possession, or upon the plaintiff after it acquired possession, the pos-

session of O'Brien and the plaintiff was not wrongful but was under and in accord with the reservation under discussion. The theory of the defendant seems to be that the conveyance by the United States to it *ipso facto* terminated O'Brien's reserved right to use and possession. But O'Brien was lawfully in possession and had the right to remain in possession until demand was made upon him, and this right, it seems plain to us, existed as to the grantee of the United States as well as to the United States itself. The defendants can therefore recover for the value of the use and occupation of the property only in case it appear that demand was made upon O'Brien or the plaintiff for possession, and then only for the period subsequent to such demand.''

The judgment is reversed.

Olney, J., Angellotti, C. J., Shaw, J., Lennon, J., Sloane, J., and Lawlor, J., concurred.

Rehearing denied.

All the Justices concurred.