**John R. WILKENSON, Plaintiff,**

v.

**DEPARTMENT OF INTERIOR OF the UNITED STATES, et al., Defendants.**

**BOARD OF COUNTY COMMISSIONERS OF MESA COUNTY, COLORADO, et al., Plaintiffs,**

v.

**James WATT, et al., Defendants.**

Civ. A. Nos. 81–M–1825, 82–M–2171.

United States District Court, D. Colorado.

May 2, 1986.

John R. Wilkenson, pro se.

Eric Damian Kelly, Pueblo, Colo., Maurice Lyle Dechant, Mesa Co. Atty., Grand Junction, Colo., for plaintiffs Board of County Com'rs of Mesa County, Colo., et al.

Bruce Black, Asst. U.S. Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

These two lawsuits challenge the authority of the National Park Service ("NPS" or "Park Service") to control access to a portion of a roadway within the boundaries of the Colorado National Monument ("Monu-

ment"). Jurisdiction over the controversy is provided by 28 U.S.C. § 1331 because the pivotal legal issues involve interpretation of pertinent federal statutes. John Wilkenson is a resident of a rural area of Mesa County, Colorado, commonly called Glade Park. It lies southwest of that portion of the Monument which is traversed by the subject segment of road. Mr. Wilkenson sued the Department of the Interior, the Secretary of the Interior, the Director of the National Park Service, the acting Deputy Director of the National Park Service, the Regional Director of the National Park Service, the Superintendent of the Colorado National Monument, and the Chief Ranger of the Monument, in the District Court, Mesa County, Colorado. The defendants removed that action to this court because of federal question jurisdiction. The Board of County Commissioners of Mesa County brought a separate action in this court, raising substantially the same issues. The cases were consolidated for trial and are now considered together in this opinion.

## THE FACTS

The trial of these cases was most unusual in that the parties cooperated in a common effort to put before the court all of the historical facts which could be relevant to the legal questions presented. Much of that evidence is documentary, and some of it is anecdotal. The primary subject of the extensive record is the history of the creation and development of the Colorado National Monument, an area of scenic canyons with interesting geological formations and marked with primitive beauty.

At present, the NPS maintains two controlled entrances to the Monument from the valley floor. The west entrance is near Fruita, Colorado, and can be reached by Colorado Highway 340. A visitor center providing pertinent information concerning recreational use of the Monument is located on the roadway inside the Monument several miles from this entrance. The park headquarters is at this visitor center. A visitor may travel by motor vehicle on a paved road from the west entrance through Fruita Canyon, past the visitor center and up along the rim of a high mesa, descend to the east entrance, exit there, and proceed on a county road called Monument Road for about 3 miles to Colorado Highway 340 near the Colorado River, and then on to Grand Junction, Colorado, a few miles distance. The trip may also be made in the reverse order from the east entrance with an exit at the west entrance, traveling then on the state highway to Fruita. This road through the Monument is commonly known as "Rim Rock Drive", and its primary purpose is to give park visitors an opportunity to view the canyons and geological formations from the comfort of an automobile. The road may be used by persons on bicycles, and there are hiking trails, campgrounds and picnic areas within the Monument.

These cases concern a portion of Rim Rock Drive extending 3.3 miles from the east entrance to a location above "Cold Shivers Point", where Rim Rock Drive intersects with a separate roadway called the "Glade Park Cut-Off", which runs southwesterly 0.6 miles, crossing the boundary of the Monument and proceeding along the edge of "No Thoroughfare Canyon" to the Glade Park Store. Attached as Appendix A is a map of the entire Monument, and Appendix B is an enlargement showing the disputed portion of Rim Rock Drive and the Glade Park Cut-Off. The road from the Monument boundary to the Glade Park Store is a Mesa County road. The 3.9 miles consisting of the 3.3 miles of Rim Rock Drive and the 0.6 miles of Glade Park Cut-Off have long been used by the public in going between the Glade Park area and Grand Junction. There is another county road which connects Glade Park and Grand Junction without entering the boundaries of the monument. That is the "Little Park Road", running to the south of the monument area. It is largely a gravel road, and parts of it are impassable in wet weather.

The conflict has followed the progress of development of the Monument as a recreational facility and the residential growth in Glade Park and the Grand Junction commu-

nity. It is a classic Western quarrel over the use of public land in which the early years were characterized by cooperation in pursuit of common interests and where now the parties have sharply conflicting interests and claims. The government's policy has gone from indulgence, through tolerance, to rigid regulation. The dispute came into this forum after attempts to enforce current regulations were met with resistance and criminal charges were filed.

### MONUMENT HISTORY

Grand Junction, Colorado was named because it is located at the junction of the Gunnison River with the Colorado River (formerly the Grand River). The Colorado River Valley runs between the Little Book Cliffs to the north, and the Uncompahgre Plateau on the south. On the northern edge of the Uncompahgre Plateau to the southwest of Grand Junction is the canyon-land area which came to be the Monument. Developing public access to and appreciation for the rugged beauty of this area became the life-long commitment of a somewhat legendary man, John Otto. He began living in the canyons in 1906. Almost immediately, he began the work of building trails to provide access to the several canyons, which came to be called No Thoroughfare Canyon, Columbus Canyon, Red Canyon, Ute Canyon, Gold Star Canyon, Monument Canyon, Lizard Canyon and Fruita Canyon.

John Otto publicized his work in the Grand Junction Daily Sentinel newspaper, and gained some support from that paper and the community. On May 24, 1911, under the authority of the Antiquities Act of 1906, President William H. Taft issued a proclamation, creating the Colorado National Monument, and specifying the original boundaries of it. Those original boundaries did not include most of No Thoroughfare Canyon.

In June, 1911, John Otto was appointed as superintendent and caretaker of the Monument. Shortly thereafter, the newspaper reported that he intended to build a road from near the mouth of No Thorough-

fare Canyon going up the right side of that canyon to the rim rocks, across the high plateau portion of the monument, and on to Moab, Utah. In the early publicity about that plan, the newspaper also stressed the importance of providing access to Glade Park from Grand Junction because the Little Park Road, which had been constructed by the county in 1884, was almost impassable. Representatives of Glade Park citizens appeared before the Mesa County Commissioners in April, 1912, requesting construction of a new road from the Main Street Bridge over the Grand River, up through No Thoroughfare Canyon, following a route which had been surveyed by the County Surveyor. No action was taken on that petition.

In December, 1912, John Otto and others formed the Colorado River Auto Transportation and Toll Road Company to construct, operate and maintain a toll road from that Main Street Bridge to the top of Pinon Mesa, and then southwest to the eastern edge of Glade Park. That appears to be the same route that was contemplated for part of the highway to Utah. In a report to the Commissioner of the General Land Office in Washington, D.C. in January, 1913, John Otto wrote that he had begun building a road to be called the Colorado River Rim Rock Route to go to the Grand Canyon of the Colorado River, and from there into Southern California. Under date of June 17, 1915, the Mineral Examiner of the General Land Office wrote of his visit to the Monument, and included the following description in his report to the Commissioner of the General Land Office:

The nearest canyon to Grand Junction, which is the principal town on the western slope, is called No Thoroughfare and is approximately 4 miles from said town. Only part of this canyon is wholly included in the National monument and it does not contain the great monoliths that the other canyons do. However, there are a great many more people visit this canyon than the others for the reason that it is nearer to town and the roads are better. Approximately one thousand people visit

this canyon a year, mostly on Sundays and it is more or less the main picnic grounds for the people of Grand Junction.

However, the most important and the main canyon is called Monument Canyon, approximately 8 miles to the southwest of Grand Junction. This is the canyon that contains the great monoliths, some of which are 500 feet in heighth. This canyon is reached by wagon road from Grand Junction but it is necessary to walk over trails for approximately one mile to reach the great monoliths. These trails have all been built by John Otto known as the Sunshine Trail Builder who was appointed care-taker of the Monument on June 7, 1911, and still holds his honorary position. Otto was engaged in the road and trail work in the Monument which he has made his life work. Single handed he has surveyed and actually built several good roads and trails and has carved steps in the monoliths which form the chief scenic features in the park. This Monument is little known even to the people of Colorado and was virtually discovered by John Otto. Others of course had journeyed through it but he was the first to realize that this should be set aside for the enjoyment and inspiration of future multitudes.

. . . . .

John Otto, L. Antlers Secretary of the Chamber of Commerce of Grand Junction and most of the business men of the town are trying to get up an interest in a sky-line drive or road along the top of the rim rock, which would extend from No Thoroughfare Canyon to Monument Canyon. This would be one of the greatest sky-line drives in the world, were such a road constructed. However, it would cost approximately $25,000.00 to build a road of this kind which makes it almost prohibitive.

Joint Exhibit 29.

Efforts of Glade Park residents to obtain road construction from the county persisted, and in October, 1920, the county commissioners approved a contract with J.S. Shaw for the construction of the Glade Park Road via the Union Trail Route. The parties have stipulated that this route is roughly the same as the Serpent's Trail which was to go along the west bank of the No Thoroughfare wash to a point near the mouth of No Thoroughfare Canyon, thence by the most feasible route to the top of the rim rock of Pinon Mesa, and then southwesterly to the east end of Glade Park. That road was completed with volunteer labor, financial contributions from Glade Park residents, and payments from the County. The situation was summarized in a letter from John Otto, dated March 25, 1931, to the Director of the National Park Service, in which Mr. Otto included the following paragraph:

"The facts are that private individuals and Mesa County in right fashion have sunk some $40,000 in the road leading from the Main Street bridge across the Colorado River,—four miles to the top of the rimrocks, where, it enters the east boundary of the C.N.M. and for a mile and a half leads through the same to Glade Park, Pinion Mesa and on to the Colo. Utah line; altogether 35 miles from Grand Junction."

Joint Exhibit 50.

Under date of December 12, 1931, Howard Baker, a landscape architect with the National Park Service, wrote the following in a report of his inspection of the Monument:

The mesa, which is the same elevation as the rim of the canyon, is reached by a road known as the "Trail of the Serpent", so-called on account of its fifty four switchbacks in 2.7 miles. This road, which is on the southeast portion of the monument, is partly within the boundary and partly outside of the boundary. The grade is steeper than the Park Service standards, and is practically a one-way road with a number of turnouts. From this road one gets a view of Cold Shivers Point, but sees none of the monoliths which are in Monument Canyon. The road then meanders over the mesa to Glade Park, a small country store, thence

north to the monument boundary, where the road ends.

Joint Exhibit 51.

President Herbert Hoover extended the area of the Colorado National Monument by a proclamation dated March 3, 1933. The added area is to the southeast, and goes part way into No Thoroughfare Canyon, including most of the Serpent's Trail. The National Park Service Appropriation Record in April, 1937, reflects $112,500.00 budgeted for work on Rim Rock Drive and for improvements to the Serpent's Trail Road. The Serpent's Trail Road route was altered and newly aligned, beginning in 1939, using CCC Camps and an ERA project for crews. The old Serpent's Trail was closed in April, 1950, when the new road was opened. The old route is now a hiking trail. On November 23, 1959, the Mesa County Commissioners adopted a resolution disclaiming any interest in the Serpent's Trail roadway as it was shown on a 1948 reprint of a 1942 map. On August 7, 1959, a small addition to the Monument was made by a proclamation from President Eisenhower. Another small tract of land was acquired in 1959. Public Law 94–78, enacted October 21, 1976, added approximately 2,800 acres to the Monument, being primarily additional portions of No Thoroughfare Canyon and Red Canyon. (90 Stat. 2732)

### FEE HISTORY

The early history of the canyons after John Otto began his work indicates that they were used primarily for recreation by people in the Grand Junction and Grand Valley area, and that ranchers and stockmen used the area which is the subject of this dispute for purposes of going to and from Glade Park and Pinon Mesa, and in moving livestock to and from summer range. John Otto, the Grand Junction Chamber of Commerce, and the Mesa County officials wanted to develop public access to the Monument to promote the business of tourism.

In July, 1937, the NPS published a general information sheet with a map of the Monument, and requested that visitors "register at the Monument entrance." No permit was required and no fee was charged. The entrance referred to was presumably the Fruita entrance because the headquarters was shown as being near that location and no entrance on the Grand Junction side was shown on the map which is a part of Exhibit 61–B. The first recorded reference to any fee is in Exhibit 61–C, an address given on February 16, 1940 by James Luther, a Ranger, in which he told of instructions given in May, 1939 to initiate a motor-vehicle permit fee of 50 cents per vehicle for use of the Monument roads, not as an entrance fee, but a payment for motor-vehicle operation. Mr. Luther explained that this was payable on entry and lasted for a calendar year, without relationship to the number of people in the vehicle or the number of times the vehicle entered the Monument. That first fee policy was also referred to in a May 27, 1939 memorandum for the Director of the National Park Service from Jesse L. Nusbaum, Superintendent of the Mesa Verde National Park, who then had jurisdiction over the Colorado Monument. The memorandum refers to fee collection at the headquarters checking station, and includes the following paragraph:

> Mr. Luther was instructed to pass without fee collection, cars of those known to him as boni [sic] fide residents of the Glade Park—Pinon Mesa Areas whose only access by road to Grand Valley communities, involves the use of sections of the Monument Road. The same condition applys [sic] to residents of Grand Valley communities whose stock grazing and farming interests in the Glade Park—Pinon Mesa Areas require motorized travel through the Monument.

Joint Exhibit 63.

Under date of September 21, 1946, custodian B.R. Finch made an historical review of the operation of the Monument for the superintendent at Mesa Verde, reporting on activities during the war years, and explaining the difficulties encountered in attempting to collect fees at a central

checking station at the headquarters campground, and in enforcing other regulations.

The August 5, 1956 edition of the Daily Sentinel reported the establishment of a toll gate on the Grand Junction side of the Monument for the purpose of collecting a tarriff of one dollar per car for the season and 50 cents for a 15-day permit. The newspaper reported that an exception was made for persons actually living or working in Glade Park, and that the Park Service had a list of all persons who were entitled to "gate passes." The thrust of the newspaper account was that many persons were angered by the charges. It was further reported that the Park Service indicated that the gate was temporary and was intended to serve as a "checking station."

The May 24, 1960 edition of a Grand Junction, Colorado newspaper, called the "Morning Sun", reported the near completion of an entrance kiosk in the middle of the road on the east or Grand Junction entrance to the Monument, to be used to give out information about the Monument, and to collect the temporary or annual permit charges. The newspaper reported that the only persons who will be exempt from the permit fee are landowners on Glade Park who use the road to reach their homes and property in Grand Junction. The June 20, 1960 issue of the same newspaper reported that Superintendent Fred J. Bussey of the Monument announced that effective July 1, 1960, the NPS did not intend to impose a toll upon persons passing through the Monument to reach the Glade Park or Pinon Mesa area, but that they would be subject to these restrictions:

All landowners, residents and employees of the Glade park [sic] and Pinon Mesa areas making frequent trips through the Monument will be issued a season gate pass. This gate pass entitles the bearer to use the shortest, most direct route to and from the Glade Park area, but, it does not entitle him to use other monument facilities such as campgrounds, picnic areas, trails, overlooks, etc.

Anyone going to Glade Park to visit friends or relatives, on business, or to picnic will be allowed to pass through the Monument without having to pay the regular vehicle fee of 50 cents for a 15 day permit or $1.00 for an annual permit. However such persons MUST enter and exit thru the East entrance, four miles from Grand Junction and must proceed directly through the Monument to the East Glade Park road without stopping for any reason, except emergencies. This privilege is in no way to be construed to mean that such persons are entitled to the use of other monument facilities such as campground and picnic areas, trails or overlooks.

Stipulated Chronology of Events, p. 15.

Some time after June 10, 1979, the NPS issued a news release announcing restrictions for commercial vehicle travel across the Monument for the 1979 summer season of June 10 through September 3. It provided that no commercial vehicles may use the Monument roadway between East Glade Park junction and the west (Fruita) Monument entrance, nor any portion of the West Glade Park Road lying within the Monument boundaries. Confusingly, it also announced that Ranger escort services would be provided, but would not be required between the hours of 9:00 p.m. and 9:00 a.m. A press release of September 18, 1979 stated that commercial vehicles would be restricted to limited night time operations, effective January 1, 1980.

In 1981, NPS adopted the further restriction on the Glade Park non-commercial traffic which was protested and led to these lawsuits. To avoid payment of the entrance fee, a person was required to complete an application and affidavit for a Glade Park permit on a form provided by NPS.

## CLAIMS OF PROPERTY RIGHTS

In 1866, Congress enacted a statute providing for the acquisition of rights of way over public lands. That statute was codified at 43 U.S.C. § 932, and provided as follows: "The right of way for the construction of highways over public land, not reserved for public uses, is hereby grant-

ed." The statute was repealed by the adoption of the Bureau of Land Management Organic Act in 1976.

The plaintiffs contend that public use of livestock trails, wagon roads, horse trails and footpaths within the area constituted acceptances of grants of right of way under this statute before the creation of the Monument in its initial boundaries by the proclamation of 1911.

The parties are in agreement that the right of way statute is applied by reference to state law to determine when the offer of grant has been accepted by the "construction of highways." *County of Cochise v. Pioneer National Title Ins. Co.*, 115 Ariz. 381, 565 P.2d 887, 890 (Ariz.Ct.App.1977).

In Colorado, the term "highways" includes footpaths. *Simon v. Pettit*, 651 P.2d 418, 419 (Colo.Ct.App.1982), *aff'd.*, 687 P.2d 1299 (Colo.1984). "Highways" under 43 U.S.C. § 932 can also be roads "formed by the passage of wagons, etc., over the natural soil." *Central Pacific Railway Co. v. Alameda County*, 284 U.S. 463, 467, 52 S.Ct. 225, 226, 76 L.Ed. 402 (1932). The trails and wagon roads over the lands which became part of the Colorado National Monument were sufficient to be "highways" under 43 U.S.C. § 932.

The defendants cite the rule of statutory construction that all words in a statute must be given effect, and argue that for the grant to be accepted, this rule requires that there be actual "construction," meaning "more than mere use" of a highway. However, in Colorado, mere use is sufficient.

[T]he statute is an express dedication of a right of way for roads over unappropriated government lands, acceptance of which by the public results from "use by those for whom it was necessary or convenient." It is not required that "work" shall be done on such a road, or that public authorities shall take action in the premises. User is the requisite element, and it may be by any who have occasion to travel over public lands, and if the use be by only one, still it suffices.

*Leach v. Manhart*, 102 Colo. 129, 133, 77 P.2d 652, 653 (1938). *See also, Nicolas v. Grassle*, 83 Colo. 536, 267 P. 196 (1928); *Sprague v. Stead*, 56 Colo. 538, 139 P. 544 (1914).

The core of the controversy in this case is the difference between concepts of a right of way. The plaintiffs contend that right of way means the access to the land for the purpose of traversing it, and the defendants' view is that a right of way for a public highway must be limited to a constructed roadway over a reasonably definite and specific route. Which of these views is correct is the controlling question on the property rights claim aspect of these lawsuits.

The parties have made exhaustive presentations of the facts and law applicable to this broad question. It is undisputed that before the original boundaries of the Monument were established by the 1911 proclamation, people and livestock traveled from Grand Junction to Glade Park, across areas which now are within the expanded boundaries of the Monument. Parts of that route, or those routes, went through private lands. It is clear that the present paved roadway from the East entrance past Cold Shivers Point, and along the Glade Park Cut-Off, was primarily constructed by, and has for many years been maintained by, the federal government. It is also clear that the DS Road from the Monument's boundary on through Glade Park is a county road, and that Monument Road which runs from the East entrance to Highway 340 near the Colorado River is, and always has been, a county road. Because the Little Park Road becomes impassable when wet, the only all-weather route serving the Glade Park community is that portion of Rim Rock Drive from the East entrance to the Glade Park cutoff, and the Glade Park cutoff. To meet the defendants' construction of the statute, the plaintiffs have painstakenly parsed this route into segments which have separate histories.

Segment 1 is that portion beginning at the East entrance and extending approxi-

mately one-quarter mile into the Monument. Here, the highway crosses land which was in private ownership from a patent in 1911 until 1940, when it was reacquired by the government. This land was not included in the Monument boundaries until 1959. Construction of the Serpent's Trail through this tract was completed by July 20, 1921. There was a difference between that route and the current route, completed as Rim Rock Drive in 1950. While the plaintiffs contend that a right of way was created under Section 932 prior to the patent in 1911, there is no clear evidence of a road traversing this land before that date. The plaintiffs also contend that while the land was in private ownership a prescriptive use right arose, which could not be divested by reacquisition by the government in 1940. Under C.R.S. § 43–2–201, roads over private lands that have been used adversely without interruption for twenty consecutive years are declared public highways. If use is limited to the Serpent's Trail, it would be for less than twenty years; July 20, 1921 to June 4, 1940, eighteen years and eleven months. Again, the difficulty is knowing exactly the routes taken by people before the completion of the old Serpent's Trail.

The next portion of the present road from the end of the first segment proceeds approximately one-half mile further into the Monument, and then turns up the old Serpent's Trail route. The first segment of this portion, designated Segment 2A, crosses lands which were patented at different times, consisting of the Streb portion, patented to William R. Streb on February 24, 1921, but occupied by him since 1906, and the Cunningham portion, patented March 1, 1909, and obviously homesteaded at an earlier time. This tract was placed within the boundaries of the Monument in 1933, but the government did not obtain reconveyance of title until February 16, 1934. Segment 2A was part of the original road completed in 1921. At that time, the land was in private ownership. Section 932 would not be applicable. The plaintiffs' argument is that this property was not properly made a part of the Monument by

the 1933 Proclamation because the Antiquities Act provided for the creation of national monuments only on lands owned or controlled by the United States and, accordingly, the reacquisition of the land merely placed it in the public domain and made it subject to Section 932 until the time of its repeal in 1976. The defendants deny that reading of the Act, pointing out that the statute provides for the relinquishment of lands held in private ownership. There is no settled precedent on the point.

Segment 2B consists of two parts of the original Serpent's Trail built on land in the public domain, and which remained in the public domain until 1933 when the Monument was enlarged to include this area. Thus, plaintiffs say that this right of way was clearly created under Section 932, and the land was included in the Monument subject to such rights. The contrary argument of the defendants is that any right of way so created was abandoned by the county resolution in 1959, discussed infra.

Segment 3 is the stretch of road which extends from the top of the Serpent's Trail, either new or old, to the Glade Park junction, where Rim Rock Drive goes off to the top of the mesa and the Glade Park Cut-Off goes into Glade Park. This segment of the road crosses lands that were included within the Monument in the original Proclamation of 1911. The Glade Park spur was built by farmers and ranchers in 1921. There is no legal basis for asserting that this particular segment of the road constitutes a right of way acquired under Section 932 because the construction was after the establishment of the Monument. There is evidence, however, that people were traversing the top of the mesa and going into Glade Park by a wagon road by 1912. The fair inference is that the road at the top must have connected with some road coming up from the bottom before the Monument was established.

The portion of the road which is the new Serpent's Trail may be considered in four separate segments. Segment 4A crosses the Streb property, and it is subject to the same argument made by the plaintiffs with

respect to Segment 2A. Segment 4B consists of two parts of Rimrock Drive built between 1939 and 1950 on property which was included in the Monument in the 1933 Proclamation. Accordingly, the plaintiffs' position with respect to segment 4B is that it constitutes a substituted route for the original Serpent's Trail which, in turn, was a vested right of way, and the old right of way access should apply to the new route.

Segment 4C was built across a patented mining claim called the Ella Mine, which was not acquired by the government until 1955. This property, like the Streb property, is within the boundary of the 1933 Proclamation, and it is subject to the same argument made with respect to the Streb property. The government built this segment of Rim Rock Drive between 1939 and 1950. Accordingly, it could be said that a public road was built on private property. The government defendants contend that, at most, this constituted an inverse condemnation action, with only the then-owner of the property having standing to claim that any right was violated. Moreover, there is no evidence that any interference of any mining operations resulted, and the patent was a mining patent.

The defendants assert that all claims to a public right of way which may have existed in the Monument before November 23, 1959 were extinguished by a resolution of the Mesa County Commissioners on that date. That resolution, apparently initiated by the NPS provided as follows:

> WHEREAS, the United States of America, through the Department of the Interior, National Park Service, has requested an expression of the position of the County of Mesa, Colorado, in reference to hereinafter described road and roadway in Mesa County, Colorado, which traverses the Colorado National Monument, and
>
> WHEREAS, the County of Mesa disclaims any interest in said roadway, but in order to resolve any doubts or uncertainty as to status of said road or roadway and any interest the County of Mesa

may have therein, it is willing to vacate said roadway, and

> WHEREAS, the United States is the owner of all land on each side of said roadway and it appears by reason thereof, said roadway is no longer needed by members of the public for ingress or egress.
>
> NOW, THEREFORE, it is hereby ordered that the hereinafter described road or roadway be, and it hereby is, vacated. The road known as the Serpents Trail located within Section 31, Township 1 South, Range 1 West and Sections 2, 10 and 11, Township 12 South, Range 101 West, in the County of Mesa, Colorado and within the boundaries of Colorado National Monument, as shown on U.S. G.S. Topographic Map of Colorado National Monument, Mesa County, Colorado, Edition of 1942, reprinted 1948.

Joint Exhibit 71.

This resolution must be considered in context. It came at a time when the new Serpent's Trail had been completed as a part of Rim Rock Drive. The old John Otto Serpent's Trail was converted to a footpath and made a part of the recreational facilities of the Monument. Obviously, the primary purpose of the resolution was to avoid any legal anomaly in that action. It is noteworthy that the third whereas clause of the resolution states that the roadway is no longer needed by members of the public for ingress or egress because the government owns the land on each side. In the context of the times, it most surely was the anticipation of the county commissioners that Rim Rock Drive and the Glade Park Cut-Off would continue to be used as the route to go to and from Glade Park. The abandonment of the old Serpent's Trail cannot be considered to have any legal significance on the question of the right of access which is at issue in these lawsuits.

The difference in the positions of the parties in this case reflects the different perspectives on the use of public land, and the present position taken by the government reflects the major change in national governmental policy marked by the enact-

ment of the 1976 statute which, in turn, reflects a change in the national experience. The 1866 right of way statute, 43 U.S.C. § 932, was enacted when this nation was young and relatively unpopulated. Obviously, the national government then encouraged expansion, exploitation and development of the public lands. The 1976 statute is for the contrary purpose of conservation, protection and preservation of the public lands.

The Colorado National Monument was created as a result of private and local community activity. The national government was, essentially, a silent partner in this project for many years. Its initial efforts were primarily a part of the public works programs of the post-depression era when one of the national policies was to put people to work. The National Park Service was well aware of all of the road-building activities which took place before its direct involvement, and it accepted the benefits of that work. It was also well aware of the importance of the opportunity to traverse this area to Grand Junction and to the people living and working in Glade Park. In its broadest form, the question in this case is whether the defendants have the lawful authority to deny the use of the disputed segments of road to persons who seek only to use them as a connecting route between Monument Road and DS Road, without making any recreational use of the Monument's facilities.

It has long been the law that the course of a right of way may be altered without destruction of the right of way. That may be by mutual consent, evidenced by acquiescence, or it may be the result of changes resultant from natural causes. Those natural causes are of great significance in the difficult terrain of a canyon, as was recognized by the Supreme Court of the United States in *Central Pacific Railway*, 284 U.S. at 463, 52 S.Ct. at 225. The following language from that case is instructive here:

> We cannot close our eyes to the fact that long before the Act of 1866, highways in large number had been laid out by local, state and territorial authority, upon and across the public lands. The practice of doing so had been so long continued, and the number of roads thus created was so great, that it is impossible to conclude otherwise than that they were established and used with the full knowledge and acquiescence of the national government. These roads, in the fullest sense of the words, were necessary aids to the development and disposition of the public lands. Compare *Flint & P.M. Ry. Co. v. Gordon*, 41 Mich. 420, 428–29; 2 N.W. 648; *Red Bluff v. Walbridge*, 15 Cal.App. 770, 778–79; 116 Pac. 77. They facilitated communication between settlements already made, and encouraged the making of new ones; increased the demand for additional lands, and enhanced their value. Governmental concurrence in and assent to the establishment of these roads are so apparent, and their maintenance so clearly in furtherance of the general policies of the United States, that the moral obligation to protect them against destruction or impairment as a result of subsequent grants follows as a rational consequence. The section of the Act of 1866 granting rights of way for the construction of highways, no less than that which grants the right of way for ditches and canals, was, so far as then existing roads are concerned, a voluntary recognition and confirmation of preexisting rights, brought into being with the acquiescence and encouragement of the general government.

It follows that the laying out by authority of the state law of the road here in question created rights of continuing user to which the government must be deemed to have assented. Within the principle of the decisions of this court heretofore cited, they were such rights as the government in good conscience was bound to protect against impairment from subsequent grants. The reasons for so holding are too cogent to be denied. When, under that grant, the railroad company designated its right of way and built its line, it must be held to have done so with knowledge of the ex-

istence of the highway and subject to its continued maintenance and use.

*Id.* at 472–73, 52 S.Ct. at 228–29.

■ The same principle dictates that the government must be deemed to have assented to continuing access over the disputed area and cannot cut off that access by the creation of the Monument and construction of a modern highway. This court holds that there is a public right of way for use of the small section of Rim Rock Drive and Glade Park Cut-Off to connect travel with Monument Road and DS Road.

## THE FEE SYSTEM

■ Because this court holds that there is a continuing public right of way across the disputed roadways, the government's imposition of a fee for such use is an invalid restriction on that right of access. That is sufficient to grant the injunctive relief sought by the plaintiffs in these civil actions. However, given the efforts of counsel in the trial of these cases, this court will address the plaintiffs' alternative claims that the fee system is invalid as applied to those who seek only the limited use of the roadways to traverse the Monument. The government's position concerning the entrance fee for admission to the Monument at both the East and West entrances changed in the course of this litigation. When these cases started, the policy at the Monument was to grant a permit, without fee, upon application and affidavit of residency in the Glade Park community and environs. At trial, the defendants took the position that an entrance fee is required by statute and cannot be waived because the statute unequivocally prohibits the granting of free permits. 16 U.S.C. § 460*l* –6a(a)(4). Accordingly, assuming that the public has no property right of access to the use of the disputed segment of Rim Rock Drive, is the imposition of an entrance fee on those persons who seek only to use the subject road for transportation through that part of the Monument an arbitrary and unreasonable administrative action?

The defendants' response is that the agency interpretation of the legislative mandate is not only rational and reasonable, it is required. The argument is that the purpose of the fee system is to raise revenues for financing outdoor recreation; that an entry fee to a national monument is charged for entry into the area without regard for the intent of the visitor, and that the entry, itself, constitutes a use of the area.

The federal recreation fee system began with the Land and Water Conservation Act of 1965, Pub.L. 88–578, 78 Stat. 897, enacted in 1964, effective January 1, 1965. The purposes of the act are set forth in it as follows:

> (b) Purposes.—The purposes of this Act are to assist in preserving, developing, and assuring accessibility to all citizens of the United States of America of present and future generations and visitors who are lawfully present within the boundaries of the United States of America such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States by (1) providing funds for and authorizing Federal assistance to the States in planning, acquisition, and development of needed land and water areas and facilities and (2) providing funds for the Federal acquisition and development of certain lands and other areas.

78 Stat. 897.

The actual authority for charging fees is contained in the following language from that statute:

> Entrance and admission fees may be charged at areas administered primarily for scenic, scientific, historical, cultural, or recreational purposes. No entrance or admission fee shall be charged except at such areas or portions thereof administered by a Federal agency where recreation facilities or services are provided at Federal expense. No fee of any kind shall be charged by a Federal agency

under any provision of this Act for use of any waters. All fees established pursuant to this subsection shall be fair and equitable, taking into consideration direct and indirect cost to the Government, benefits to the recipient, public policy or interest served, and other pertinent factors. *Nothing contained in this paragraph shall authorize Federal hunting or fishing licenses or fees or charges for commercial or other activities not related to recreation.* No such fee shall be charged for travel by private non-commercial vehicle over any national parkway or any road or highway established as a part of the national Federal-aid system, as defined in section 101, title 23, United States Code, or any road within the National Forest system or a public land area, which, though it is part of a larger area, is commonly used by the public as a means of travel between two places either or both of which are outside the area. No such fee shall be charged any person for travel by private noncommercial vehicle over any road or highway to any land in which such person has any property right if such land is within any such designated area.

78 Stat. 897, 898 (emphasis added).

The 1965 Act has been amended from time to time, and the amendments reflect the continuing tension between the view that the use of most park facilities and services should be without specific charge to the visitors, with the cost born by the general taxpayers, and the view that those who actually use the parks should pay a proportionately greater share than the public at large. An interesting history of the legislative and administrative application of the fee principle is contained in a study by Barry McIntosh of the National Park Service, dated December 7, 1982, and attached to the defendants' supplemental brief. Budgetary restraints have played a significant role in that history. There was a repeal of the interagency fee authorization by enactment of Pub.L. 90–401, 82 Stat. 354 in 1968. The 1972 Land and Water Conservation Fund Act Amendment made it clear again that fees must not be charged to persons engaged in commercial or other activities not related to recreation. It repeated the underscored language in the prior quotation from the 1965 Act, which now appears in the Code at 16 U.S.C. § 460l–6a(g).

The regulations essentially parrot the legislation. 36 C.F.R. § 71.2 identifies three types of Federal recreation fees: (a) entrance fees, (b) daily recreation use fees, and (c) special recreation permit fees. 36 C.F.R. § 71.3 establishes criteria for the identification of areas to be designated as areas for which entrance fees shall be charged. Those criteria are as follows:

(1) The area is a unit of the National Park System administered by the Department of the Interior;

(2) The area is administered primarily for scenic, scientific, historical, cultural, or recreation purposes;

(3) The area has recreation facilities or services provided at Federal expense; and

(4) The nature of the area is such that entrance fee collection is administratively and economically practical.

36. C.F.R. § 71.3(a).

36 C.F.R. § 71.13(d) provides as follows:

No Federal recreation fee shall be charged for commercial or other activities not related to recreation, including, but not limited to, organized tours or outings conducted for educational or scientific purposes related to the resources of the area visited by bona fide institutions established for these purposes. Applicants for waiver of fees on this basis will be required to provide documentation of their official recognition as educational or scientific institutions by Federal, State or local government bodies and will also be required to provide a statement as to the purposes of the visit proposed. The use of any recreation facilities for which a fee waiver is requested must relate directly to scientific or educational purposes of the visit and may not be primarily for recreational purposes. No Federal recreation fee shall

be charged any hospital inmate actively involved in medical treatment or therapy in the area visited.

36 C.F.R. § 71.13(d) (emphasis added).

It is here that the regulations appear to depart from the statute. Although the language of the regulation does not limit the excepted activities to educational or scientific purposes, the defendants have interpreted the regulation as if the "but not limited to" phrase does not exist. As previously noted, the statute prohibits charging any fee "for commercial or other activities not related to recreation." There is nothing in the statute or in the legislative history that indicates any congressional intent to restrict this language as it has been done by the Secretary. Accordingly, the action of the Secretary in authorizing by regulation, and the action of the superintendent in charging fees for those using the subject roads solely for going to and from the Glade Park area are actions in excess of statutory authority and are unlawful and must be set aside under 5 U.S.C. § 706(2)(C).

Even if that statutory prohibition were not dispositive, the charging of the entrance fee to Glade Park traffic would constitute arbitrary and capricious regulation. While the regulation classifies fees in the three types already indicated, it is clear that all of these classifications are based on recreational use. The three types of fees are different only in the methods of collection. The defendants make much of the point that the disputed road includes some of the scenic portions of the Monument. But, the only added facilities in that area are the Devil's Kitchen picnic area, and the Devil's Kitchen Trail and Serpent's Trail footpaths. Surely it is not beyond the administrative capabilities of the National Park Service to devise a means for limiting access to those facilities to those who pay the entrance fee. In any event, the overwhelming majority of the scenic wonders and special features of the Monument are located between the Glade Park Cut-Off and the Fruita entrance. Thus, the placement of a fee collection station at the Glade Park Cut-Off would not interfere with travel over the subject roadway by those not making recreational use of the Monument, and provide a reasonable and practical method for collecting fees charged to those who are recreational users of the remainder of the Monument. That action would better recognize the true nature of the area and its unique historical past. It would also comply with the criteria in 36 C.F.R. § 71.3.

## COMMERCIAL TRAFFIC

The commercial traffic use of the disputed roads is a matter which involves somewhat different questions. The regulation appears at 36 C.F.R. § 5.6 and reads as follows:

(a) The term "Commercial vehicle" as used in this section shall include, but not be limited to trucks, station wagons, pickups, passenger cars or other vehicles when used in transporting movable property for a fee or profit, either as a direct charge to another person, or otherwise, or used as an incident to providing services to another person, or used in connection with any business.

(b) The use of government roads within park areas by commercial vehicles, when such use is in no way connected with the operation of the park area, is prohibited, except that in emergencies the Superintendent may grant permission to use park roads.

(c) The Superintendent shall issue permits for commercial vehicles used on park area roads when such use is necessary for access to private lands situated within or adjacent to the park area, to which access is otherwise not available.

36 C.F.R. § 5.6.

The Mesa County plaintiffs assert that this regulation is invalid because it is beyond the statutory authority of the National Park Service. 16 U.S.C. § 1 requires that the National Park Service "promote and regulate" national parks and monuments "by such means and measures as conform to [their] fundamental purpose" which "is to conserve the scenery and the

natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 3 authorizes the Secretary of the Interior to make such rules "for the use and management" of national parks and monuments "as he may deem necessary or proper."

■ None of these statutes *expressly* authorizes the regulation of commercial traffic in the Colorado National Monument. However, the grant of authority to the Secretary is very broad.

In support of the assertion that the regulation prohibiting commercial traffic in the Monument is a valid exercise of the government's power, the defendants cite *Robbins v. United States*, 284 F. 39 (8th Cir.1922), in which the United States sought to enjoin the defendant from transporting passengers for hire, without written permission from the director of the National Park Service, in the Rocky Mountain National Park in Colorado. The Secretary of the Interior had published a regulation prohibiting such traffic in the Park. The defendant asserted that at the time the Park was created, there were public highways in the area and that the regulations as applied to him were "unreasonable and void." The court held:

> [W]e are of the opinion that the power of the government to regulate the traffic on those highways, as it has done by congressional enactment and rules thereby authorized, rests on the secure footing that it is a valid exercise of control over the property of the government, even though it is of the nature of police power, and that it is sustained by section 3, art. 4, of the federal Constitution, which entitles the government to make all needful regulations respecting its territory and property.

*Id.* at 45.

More recently, in *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34, *reh. denied*, 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154 (1976), the Supreme Court held that the Wild Free-roaming Horses and Burros Act, 16 U.S.C. §§ 1331 *et seq*, enacted to protect wild free-roaming horses and burros "from capture, branding, harassment, or death," was a valid exercise of the Congressional power under the Property Clause and that "while the furthest reaches of the power granted by the Property Clause have not yet been definitively resolved, we have repeatedly observed that '[t]he power over the public land thus entrusted to Congress is without limitations.'" *Id.* at 539, 96 S.Ct. at 2291 (citations omitted).

Mesa County cites *Colorado v. Toll*, 268 U.S. 228, 45 S.Ct. 505, 69 L.Ed. 927 (1925), for the proposition that the federal government has power to regulate under the Property Clause only over property belonging to the United States, and that this includes only property ceded to the government by the state or private landowner. But this was addressed by the Supreme Court in *Kleppe, supra*, when it stated that "while Congress can acquire exclusive or partial jurisdiction over lands within a State by the State's consent or cession, the presence or absence of such jurisdiction has nothing to do with Congress' powers under the Property Clause." *Id.* 426 U.S. at 542–43, 96 S.Ct. at 2293.

■ To sustain the Secretary's construction of a statute which the Secretary is charged with administering, this court need not find that the Secretary's construction is the only reasonable one or even agree with that construction. *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964), *reh. denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). The court must uphold the Secretary's action if there is a rational basis for it. *Udall v. Washington, Virginia and Maryland Coach Co.*, 398 F.2d 765 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1017, 89 S.Ct. 622, 21 L.Ed.2d 561 (1969); *Sabin v. Butz*, 515 F.2d 1061 (10th Cir.1975).

Plaintiffs argue that there is no rational basis for the distinction made by the National Park Service between commercial and non-commercial traffic and that the prohibition on commercial traffic is arbi-

trary and unreasonable as applied to the Colorado National Monument. The defendants assert that the prohibition is reasonable because, among other things, "[t]he impact of heavy commercial vehicle traffic on the Monument is substantial, both in degradation of the road and in the safety hazard presented." Defendants' Supplemental Brief, p. 12.

■ The reasons advanced by the defendants for the ban on commercial vehicles are within the scope of the Secretary's authority to prescribe rules and regulations to "conserve the scenery and the natural and historic objects and the wild life [in the national parks and monuments] and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. There is a rational basis for the regulation, even as applied to the Colorado National Monument. The regulation is valid and must be upheld.

The defendants have misapplied their own regulation. Under 36 C.F.R. § 5.6(c), permits must be issued for the use of park area roads when it is necessary for access to private lands adjacent to the park area to which access is otherwise not available. What is clear from the evidence here is that the disputed segment of Rim Rock Road and Glade Park Cut-Off constitute the only all-weather access to the Glade Park and Pinon Mesa property for commercial vehicles. Accordingly, permits must be granted for commercial vehicles to use that portion of the road for that purpose, and it would be wholly impracticable to require a determination about whether the Little Park Road was or was not available for use at any given day or time of day.

■ Moreover, the regulations should be applied in a way which would make them valid. This court has previously determined that the public has a right of access across the subject road segments for purposes of going between Grand Junction and Glade Park. That right of access is not limited to residents of Glade Park. It includes all of the public, including commercial vehicles. Size and weight restrictions would appear to be appropriate matters for regulation, and control over hazardous substance transportation is necessary. These are matters which are not now before the court in the present litigation. The holding now is that the absolute prohibition of all commercial traffic in the disputed area is unauthorized by the existing regulation and is contrary to the public's right of way.

## SUMMARY

While there is no direct and controlling precedent for the legal conclusions reached in this opinion, the unique factual history of the development of the Colorado National Monument requires recognition of an obligation on the National Park Service to permit public use of that portion of Rim Rock Drive from the East entrance to the Glade Park Cut-Off and the Glade Park Cut-Off Road within the Colorado National Monument for the limited purpose of continuous travel between the Monument road and the DS Road, subject to such limitations with respect to vehicle size, cargo, speed and other traffic limitations as may be necessary for the safety of persons and property and the protection of the federal property interests involved. The charging of a fee for such non-recreational use is an unlawful interference with that property right of public use and is, additionally, contrary to the statutory limitations on the authority of the National Park Service to charge entrance fees or other recreational use fees under 16 U.S.C.A. § 460l–6a(g). Moreover, the charging of an entrance fee for this use is a violation of the regulations at 36 C.F.R. § 71.13(d). Accordingly, the plaintiffs are entitled to declaratory and injunctive relief.

Upon the foregoing, it is

ORDERED, ADJUDGED AND DECREED, that a public right of way exists in that portion of Rim Rock Drive extending from the East entrance of the Colorado National Monument to the Glade Park Cut-Off, and across the Glade Park Cut-Off,

connecting the DS Road in Glade Park with the Monument Road to Highway 340, and the use of that road for the purpose of continuous travel through the Monument is a non-recreational use for which no entrance fee may lawfully be charged, and the defendants are enjoined from charging any such fee or otherwise preventing such non-recreational use of the roadways. The Clerk shall enter judgment, accordingly, and the plaintiffs are awarded their costs upon the filing of a bill of costs within 10 days from the entry of judgment.

## APPENDIX A