[No. C037523. Third Dist. July 17, 2002.]

WESTERN AGGREGATES, INC., Plaintiff and Appellant, v. COUNTY OF YUBA, Defendant and Respondent.

282

## Counsel

Morgenstein & Jubelirer, Jean L. Bertrand and David H. Bromfield for Plaintiff and Appellant.

Daniel G. Montgomery, County Counsel; Van Bourg, Weinberg, Roger & Rosenfeld, Stanley A. Coolidge and David A. Rosenfeld for Defendant and Respondent.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez and Peter Southworth, Deputy Attorneys General, as Amici Curiae on behalf of Defendant and Respondent.

## Opinion

**MORRISON, J.**—This case involves a gravel moonscape left by hydraulic mining in the 19th century; in the background it features ferries, stage coaches, gold dredging, abandoned towns, access to the Yuba River and millions of dollars worth of high-quality construction aggregates (sand and gravel).

During labor unrest, Western Aggregates, Inc. (Western) had several union members arrested for trespass in the Yuba Goldfields. Some arrestees filed civil rights suits in state and federal court, naming the County of Yuba (County) as one of the defendants. This was the *King* litigation of which judicial notice was taken at trial. (See *King v. Western Aggregates, Inc.* (Apr. 21, 2000, C031188) [nonpub. opn.] (*King*).) Their theory was that they were

on a public road and therefore County officers should not have participated in the arrests, because no trespass occurred. In defense of these suits, the County asserted the arrests did not take place on public property. In addition, citizens want to use the road to reach recreational sites.

Western sued the County to quiet title to the portions of Western's property over which it was claimed an historic public road ran. After a court trial, the trial court concluded a public road existed, although the original route had changed.

We affirm the trial court's central finding that an historic public road exists through the Goldfields. Western has no right to bar the public from using the road and as of the finality of this decision the trial court shall exercise its jurisdiction to enforce the public's right to use this road. We remand with directions only for the limited purpose of finally resolving this controversy by specifying the exact metes and bounds of that public road.

FACTS

The records of the County Board of Supervisors (Board) and its predecessor, the Court of Sessions, as well as the federal government, establish the existence of a County road known as the Marysville-Nevada Road, which ran along the south side of the Yuba River in the 1850's.

An 1851 map based on surveys of the Feather and Yuba River areas shows a road running from south of Marysville past Ousley's Bar and Park's Bar, two of the mining bars on the Yuba River. An 1850 Court of Sessions order, authorized by statute (Stats. 1850, ch. 81, § 1, p. 200), had made all wagon roads public highways. The trial court found "More likely than not, the historical 'Marysville-Nevada Road' already existed . . . at the time of the 1850 [order], and was encompassed within its terms."

In 1853-1854, the United States Department of the Interior began surveying townships in the Marysville area. Field notes from those surveys confirm the existence of a road running on the south side of the Yuba River from Marysville to Nevada County. An 1855 map based on the surveys shows a road on the south side of the Yuba River, designated as the "Marysville & Nevada Road." Miners used the road to get to Marysville to the west or to Nevada County to the east.

In February 1853, the Court of Sessions directed survey of a road from "the upper end of Ousley's Bar and running to a ferry opposite the Wooster Place," and the field notes show this road on the south side of the river. Later in 1853, the Board approved a ferry license for John Weiser.

In May 1855, the Board ordered that roads "now traveled by wagons and pack mules" be public highways.

Beginning in 1855, the federal government began issuing township plat maps of the area, which reflect the existence of a road on the south side of the Yuba River. On November 14, 1855, the Board commissioned another survey to "locate a road from Weiser's Ferry on the Yuba River through the mining localities of Sand Hill, Sucker Flat and Timbucktoo [sic] to the main road leading from Marysville to [Nevada County.]"

On February 3, 1858, the Board voted to vacate a short segment of the Marysville-Nevada Road because a parallel road duplicated it. A few days later, on February 9, 1858, the action was rescinded. In rescinding the first action, the Board confirmed the road was a public highway.

An 1861 commercial directory lists post offices in Ousley's Bar and Timbuctoo and lists stagecoach lines from Wiser's Ferry past Ousley's Bar.

The Board approved an official County map in 1861, and it shows a County road along the south bank of the Yuba River from Weiser's Ferry past Timbuctoo and into Smartsville.

The federal and state governments owned the disputed land in the 1850's and mostly into the 1870's.

By 1867, the federal government had completed plat maps for the relevant townships. They show the Marysville-Nevada Road ran as shown in the 1861 Yuba County map. The County's expert was able to examine the field notes and determine that the plat maps were accurate, and the location of the Marysville-Nevada Road can be traced to the present time with reasonable accuracy from the Park's Bar Bridge running west.

Charles Whitecotton was the County's expert. He prepared exhibit No. 105, a composite of assessor's maps, and at trial marked the path of the road by connecting dots where he could ascertain the road had been by looking at the original field survey notes. Whitecotton finds assessor's maps "to be the most accurate as showing boundaries." He also prepared exhibit No. 104, which is a translucent map that shows the relevant township plats. He compared the field notes reflected on exhibit No. 105 with exhibit No. 104 and they largely matched. The survey notes plotted the road at the section (mile) lines because the townships had not then been platted. The accuracy between the plots depended on the terrain, but by employing topographic maps, "surprising" accuracy is possible.

In 1877 a petition was filed alleging residents near the road had closed part of it. The district attorney made a report, and the Board found the road was a County road and ordered removal of the obstructions. An issue at trial was the meaning of "Walters & Co. Ranch" in the minutes relating to this incident. Western asserted it referred to a corporation, not land owned by Walters and Smith. Whitecotton took the view that "Walters & Co." meant Walters and his associates, and therefore the road referred to related to the parcels at issue herein.

Based on this evidence from 1850 to 1877, Western's trial expert, Philip Sutherling, admitted there is evidence showing the Marysville-Nevada Road was a County road.

During the late 19th century, there is little documentary evidence of activity along the Marysville-Nevada Road. But Sutherling admitted that substantial mining continued in the area and there was a need for access.

Interest in this area expanded in the 1890's-early 1900's when private mining companies began dredging for gold along the Yuba River. The company town of Hammonton, named after Wendell P. Hammon, was founded on the south side of the river between about 1902 and 1905. Hammonton was the site of massive dredging in the early 1900's, when at least four major dredging companies operated in the area. Hammonton Road, as part of the Marysville-Nevada Road was then called, was the main access route to Hammonton and the company town of Marigold. As the dredgers proceeded, the road along the south bank of the river was repeatedly dug up and rerouted. It was understood that any company that dredged through the road had to relocate it. One of Western's predecessors acquired some parcels in a 1915 deed, which reserved "the ranch and county roads now upon . . . the property," and required that roads were to be replaced "in substantially the same condition," and "in approximately the same location" after dredging.

Western's predecessor, Yuba Consolidated Goldfields, acquired the other dredging companies by 1930.

The California Debris Commission (CDC) was formed by Congress to counter the effects of hydraulic mining. (See *Gray v. Reclamation District No. 1500* (1917) 174 Cal. 622, 628-630 [163 P. 1024].) In June 1908, there is an exchange of correspondence between one of Western's predecessors and the Army Corps of Engineers, referring to "main traveled road to Hammonton" and the need to keep the road open for use by the public. In 1909, there is an extensive diary with repeated references to CDC work on the "county road" by various dredging companies and others. The road

mentioned is near the Yuba River camps erected for the CDC work. (See *Yuba Inv. Co. v. Yuba Consol. G. Fields* (1920) 184 Cal. 469 [194 P. 19] [describing some of the CDC work].)

The official Yuba County maps of 1909, 1914 and 1917 show Hammonton Road as a county road.

Exhibit P is a report to Western's counsel by Sutherling, in connection with the *King* litigation, see *ante*, dated March 22, 2000. It recites Sutherling's conclusions regarding various pieces of evidence claimed to show the road was public. James K. O'Brien (a successor to James O'Brien in some of the chains of title) filed an affidavit in United States District Court stating the public used the road from Hammonton to Marysville. It also states the outcome of that litigation: The Marigold Dredging Company could dredge the road "as long as a suitable detour road was provided." It appears the affidavit was filed in 1918-1925, although the precise date is not stated.

Newspaper articles between 1910 and 1930 discuss the use of County funds to improve the road to Hammonton. Parts of the road were not then passable all the way to Park's Bar Bridge, but the road went at least through Hammonton. By the late 1930's, the road from Marysville into Hammonton and Marigold was paved and open to the public.

The County maintained the road into Hammonton during the 1930's and 1940's. A 1934 state traffic survey shows 100 to 500 cars used Hammonton Road each day, and called it an important county road. A 1937 map shows the County maintained a paved road to and past Hammonton, and to Marigold.

The official 1941 Yuba County map shows a road through Marigold and Hammonton to the Park's Bar Bridge, designated with double-parallel lines just as the road to Hammonton had been on the 1909, 1914 and 1917 official County maps. A 1949 map prepared by the County shows Hammonton Road as a "County local road, old," and shows a road running east from Hammonton towards the Park's Bar Bridge as a "county local road, new."

A witness testified his uncle drove him through the towns of Marigold and Hammonton and east all the way to the Park's Bar Bridge in 1949 without encountering any obstacles.

Hammonton was dredged out of existence about 1957.

In 1966, Otis Kittle, an engineer for the Army Corps of Engineers, investigated and issued a report on "the origin and present status of the

Hammonton Road running north from the junction with the Marysville-Smartsville Road to the (now-abandoned) towns of Marigold and Hammonton." Kittle concluded "[t]he road's early establishment and acceptance as a public road and its continuing use to the present by the general public" made it a public road. In part Kittle describes interviews with three knowledgeable people who believed Hammonton Road was a public road. The first was a County road commissioner. The second was C.D. Brophy, Western's predecessor's caretaker (and later company superintendent): He stated the road was a public road maintained by the county, that the company had mistakenly installed a locked gate in 1965, and the gate had been locked open to prevent future mistakes. The third was the chief of the Sacramento survey section of the Army Corps of Engineers: He had personally used and known the road as a public road since 1927.

In 1968, Western's predecessor gave an easement to the United States granting access to an "existing haul road." A stated reference point for the easement included "a point in the center of the public road known as the Hammonton Road."

In the 1970's, Western's predecessor gated the road. Too little gold remains in the area to be mined, and Western now sells sand and gravel from the goldfields.

Western's brief states there is "overwhelming evidence that . . . between 1905 and 1999, operators in the Goldfields have repeatedly torn up, dredged through, rerouted, blocked, and gated these roads." We accept this factual admission. (*County of El Dorado v. Misura* (1995) 33 Cal.App.4th 73, 77 [38 Cal.Rptr.2d 908].)

In litigation between private parties, the County Superior Court issued a judgment finding an historical road had existed. (*Henwood v. Yuba Co. Nat. Resources* (Super. Ct. Yuba County, No. 43426) (*Henwood*) [the *Henwood* case, of which judicial notice was taken].) In part, the *Henwood* judgment indicates that in 1901 "there was an existing roadway which ran in a generally westerly and southerly direction from the Park's Bar Bridge along the south bank of the Yuba River to what is now this Hammonton-Smartsville Road." Between 1905-1915, it was severed by the CDC work. "The evidence also reveals that there were a number of floods and washouts in the early 1900's, and also the quarry commenced operations during this time. The road appears to have been re-routed around the quarry site. . . . [T]he evidence points to the fact that the portions of the road lying to the east of the [CDC site] was further broken up during storms and fell into almost total disuse. . . . By the late 1960's, only bits and pieces of a road or roads

existed in this area east of [the CDC work]. However, it is impossible for the Court to tell if these remnants were left over from the original Historical Road or were a result of new roadbuilding activities."

The County conceded the road through Hammonton to the Park's Bar Bridge did not equate to the Marysville-Nevada Road, but the trial court found it functioned in its stead.

DISCUSSION

I. *Scope of review on appeal.*

A. *Standard of review.*

Western points out that the "de novo standard of review . . . applies to mixed questions of law and fact when legal issues predominate." (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].) ▪ But this trial was a contest of competing evidence, including expert testimony. The facts are not intermixed with legal issues and therefore we do not apply de novo review, but view the evidence in favor of the judgment. (*Bancroft-Whitney Co. v. McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

B. *Any evidentiary quarrels are waived.*

▪ Almost none of the evidence just summarized is described in Western's briefs, and what evidence Western does mention is portrayed favorably to Western. Western asserts it raises strictly legal claims, and chastises the County for including a thorough statement of facts in its brief.

▪ The County points to the rule that an appellant has the duty to fairly summarize the facts in the light favorable to the judgment, and correctly points out that the failure to do so results in a waiver of evidentiary claims. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) The duty to adhere to appellate procedural rules grows with the complexity of the record. (See *Akins v. State of California* (1998) 61 Cal.App.4th 1, 17, fn. 9 [71 Cal.Rptr.2d 314].) This court recently issued a decision emphasizing the importance of a thorough and accurate statement of facts. (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 112-114 [113 Cal.Rptr.2d 90] ["Despite their own deficient statement of the facts, plaintiffs have the chutzpah to complain about . . . defendants' statement of facts."].)

▪ Although Western contests some facts in footnotes, these points are not headed as arguments and are waived. (Cal. Rules of Court, rule 14(a);

*Landa v. Steinberg* (1932) 126 Cal.App. 324, 325 [14 P.2d 532].) Thus it is true that Western does not explicitly raise evidentiary issues. But legal issues arise out of facts, and a party cannot ignore the facts in order to raise an academic legal argument. "[A]ppellate counsel should be vigilant in providing us with effective assistance in ferreting out all of the operative facts that affect the resolution of issues tendered on appeal." (*Lewis v. County of Sacramento, supra,* 93 Cal.App.4th at p. 113.)

Western has not waived the legal issues it raises. But in addressing Western's issues we will not be drawn onto inaccurate factual ground. Western disavows any quarrel with the facts, both implicitly by omitting a fair statement of facts, and by chastising the County for providing this court with a thorough statement of facts. If Western had had any disputes about the facts as found by the trial court, they have been waived. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at p. 881.)

### C. *We will not consider the new trial exhibits.*

■ As the County observes, Western's brief relies on new trial motion exhibits. Western asserts these exhibits should be factored in with the trial evidence and reviewed de novo. Western goes so far as to assert: "[I]t would be nearly impossible to decide this case without" considering these exhibits "and we urge the reader to [consult them] before even commencing to analyze the briefs."

Western bore the burden of proof in its quiet title action. (*Ernie v. Trinity Lutheran Church* (1959) 51 Cal.2d 702, 706 [336 P.2d 525] (*Ernie*).) Western's brief leaves the reader mystified as to what was introduced at trial and why critical evidence was not.

We decline to look at these exhibits for several reasons.

First, Western has not argued that a new trial should have been granted. We decline to make the argument for Western. (See *People v. Gidney* (1937) 10 Cal.2d 138, 142-143 [73 P.2d 1186].)

Second, the new trial motion was not brought on the ground of newly discovered evidence.

Third, we do not have these exhibits. The parties stipulated that the record should contain "all exhibits either admitted into evidence or rejected at trial," but that does not include these exhibits. Where exhibits are missing we will not presume they would undermine the judgment. (*Pomerantz v. Bryan Motors, Inc.* (1949) 92 Cal.App.2d 114, 117 [206 P.2d 440].)

Fourth, Western's assertion that these exhibits depict in a more convenient form evidence already introduced at trial is not correct, as the County pointed out in its opposition to the new trial motion. They were maps that expert creators opined were accurate. Their foundation had not been tested in the trial court. It would be improper to consider them on appeal. (See *Love v. Wolf* (1964) 226 Cal.App.2d 378, 392, fn. 4 [38 Cal.Rptr. 183].)

Fifth, the gist of the maps, according to the declarations, is that "although there is some overlap between the 19th Century road . . . and the 1999 haul road . . . they are not congruent over most of either road's length." At oral argument counsel asserted the CDC moved the Yuba River by over a mile and the roads varied at some points by up to a third of mile. That the road has been rerouted is conceded.

Sixth, Western has waived any challenge to the evidence.

We disregard the briefing that relies on these exhibits.

## II. *A public road exists through the Goldfields.*

At oral argument and at various points in its briefs Western assumes "formal procedures" were required to establish a road in California at the relevant times. Because Western assumes no "formal" road existed, it builds its case by arguing the only road was a road by prescription, which could be lost by disuse. The predicate for this claim is erroneous: This case is not about a road by prescription, but by dedication, principally by a federal statute. Western refers to the federal statute *en passant*, but does not come to grips with its sweep. In this part we will discuss the historic federal mining law of 1866, which opened federal lands to exploration, reversing a prior federal policy of reserving lands. The federal law incorporated state law principles, both generally regarding local laws and mining customs, and in particular regarding roads. Therefore, we will describe the laws regarding roads applicable in California and Yuba County. We will conclude an 1855 Board order made the then existing road public as far as state law was concerned, although the road, or much of it, ran over federal lands. In 1866, the federal government dedicated the federal lands for use as a public highway, thus confirming, as a matter of federal law, the public nature of the road. The owners of the parcels privately owned before 1866 impliedly dedicated those portions to public use.

### A. *Pre-1866 California Conditions.*

When gold was discovered in California, a wave of hopeful people (mostly men) rushed to California, and statehood followed shortly, in 1850.

(See Holliday, Rush for Riches (1999) pp. 56-99.) By then, a number of legal questions had arisen.

Upon the cession of California by Mexico, title to all lands not vested in individuals passed to the United States, pursuant to the Treaty of Guadelupe Hidalgo. Upon statehood, sovereignty passed to California. "Thenceforth, the only interest of the United States in the public lands was that of a proprietor[.]" (*Woodruff v. North Bloomfield Gravel Mining Co.* (C.C.D.Cal. 1884) 18 Fed. 753, 772.)

The common law and the civil law (from Rome through Spain and Mexico) held that a gold mine presumptively belonged to the sovereign. (1 Lindley on Mines (2d ed. 1903) §§ 2-4, pp. 6-9; *id.*, §§ 11-12, pp. 16-19 (Lindley); see *Moore v. Smaw and Fremont v. Flower* (1861) 17 Cal. 199, 212-216 (*Fremont v. Flower*).) An early position of the federal government was that the United States succeeded to the gold regardless of the title to land. (Yale, Legal Titles to Mining Claims and Water Rights, in California (1867) pp. 21-22, 27-29 (Yale).)

This position defied local customs and was abandoned. In a seminal opinion by Chief Justice Stephen Field, who was intimately familiar with local mining customs, the California Supreme Court overruled prior holdings and concluded that a United States government patent presumptively conveyed the minerals underlying the land. (*Fremont v. Flower, supra,* 17 Cal. at pp. 224-226; see Yale, *supra,* p. 88 [as a Yuba County Assemblyman, Field wrote the California statute enforcing local mining customs].)

Long before this legal point was resolved or the California lands were surveyed, thousands of miners had begun work: They were trespassers. (See *Boggs v. Merced Mining Co.* (1859) 14 Cal. 279, 374-375; *Irwin v. Phillips* (1855) 5 Cal. 140, 146.)

The United States had had a policy of reserving valuable mineral lands and not opening them to free exploration. (*Deffeback v. Hawke* (1885) 115 U.S. 392, 401 [6 S.Ct. 95, 98-99, 29 L.Ed. 423, 425] (per Field, J.).) Associate Justice Field stated for the United States Supreme Court: "The discovery of gold in California was followed, as is well known, by an immense immigration into the State, . . . The lands in which the precious metals were found belonged to the United States, and were unsurveyed, and not open, by law, to occupation and settlement. . . . For eighteen years, from 1848 to 1866, the regulations and customs of miners, as enforced and molded by the courts and sanctioned by the legislation of the State, constituted the law governing property in mines and in water on the public mineral

lands. . . . The policy of the country had previously been . . . to exempt such lands from sale. . . . [The 1866 act] continued the [de facto] system of free mining, holding the mineral lands open to exploration and occupation, subject to legislation . . . and to local rules." (*Jennison v. Kirk* (1878) 98 U.S. 453, 457-459 [25 L.Ed. 240, 242-243].)

## B. *The 1866 federal act.*

The 1866 federal act abruptly shifted national land policy from one of "reservation" or withholding of land except for specified purposes to one of opening the land to all comers, to speed economic development and settlement, primarily in the vast western states, during the immediate post-Civil War era. (Yale, *supra*, pp. iv-v, 10-13 [describing legislative process, including desire to pay off the federal war debt].) This unprecedented shift in outlook toward federal lands left the policymakers somewhat at sea regarding the method to achieve the new goals. Two critical features of this broad law are directly pertinent to this case. First, the law incorporated state law principles, eschewing the implementation of national standards, regarding acquisition of roads over public lands. Second, no application was necessary to acquire specified rights over federal lands, including roadways, nor did such roads have to be recorded after they were established. This made the creation of roads extremely easy in the West, and thousands of roads created under the 1866 act continue to exist. But given the varying state laws applicable to the creation and maintenance of those roads, and given that no recordation of roads was required by federal law (or by most state laws), widespread confusion ensued.

The federal act was "faulty and crude in the extreme, and the embarrassments surrounding its proper interpretation are still encountered in the courts[.]" (Lindley, *supra*, § 54, p. 81; see Yale, *supra*, pp. 9-13.) However, according to Judge John F. Davis, a mining law expert, "The passage of this law was heralded by the press of the whole Pacific slope as the greatest legislative boon conferred upon it by congress since the admission of California into the Union." (Davis, *History of the Mining Laws of California* in Bench and Bar of California (1901) p. 310.) "This law of 1866 was more important as marking an era in the land policy of the government than as an effective means of settling mining titles. In fact, we are sometimes tempted to believe that was the only good that came of it." (*Id.* at p. 311.) Apart from reversing the "ancient" and "illiberal" policy of reservation (Yale, *supra*, pp. iv-v), the act was a "legislative boon" to California because the structure of the act, as a whole, defers to local existing conditions, customs and laws. (*Id.* at pp. 355-356, 358-359.)

In particular, for our purposes, the federal act of July 26, 1866 (14 Stat. 251, 253) provided in part: "The right of way for the construction of

highways over public lands, not reserved for public uses, is hereby granted." This provision is often referred to as "Revised Statutes 2477" or by its later designation, 43 United States Code section 932, since repealed by the Federal Land Policy and Management Act of 1976 (FLPMA). (Pub.L. No. 94-579 (Oct. 21, 1976) 90 Stat. 2743, 2793, codified at 43 U.S.C. § 1701 et seq.; see *U.S. v. Gates of the Mountains Lakeshore Homes* (9th Cir. 1984) 732 F.2d 1411, 1413, fn. 3; *Wilkenson v. Dept. of Interior of United States* (D.Colo. 1986) 634 F.Supp. 1265, 1272 (*Wilkenson*).) We will refer to the provision as R.S. 2477, its most popular name. (See Latta, *Public Access over Alaska Public Lands as Granted by Section 8 of the Lode Mining Act of 1866* (1988) 28 Santa Clara L.Rev. 811, fns. 2-3 (Latta):)

Roads to access mines and link towns were critical to the federal policy of open exploration. "Good communication throughout mining districts is indispensable for thorough development and economical working, affording rapid and cheap intercourse with the sources of supply, as well as among the adjacent mines." (Yale, *supra*, p. 378.) "The object of the grant was to enable the citizens . . . to build and construct such highways across the public domain as the exigencies of their localities might require, without making themselves liable as trespassers." (*Wells v. Pennington County* (1891) 2 S.D. 1 [48 N.W. 305, 306].)

Pre-1976 R.S. 2477 roads are entitled to protection. (43 U.S.C. § 1769(a); *South. Utah Wilderness All. v. Bureau of Land Man.* (D. Utah 2001) 147 F.Supp.2d 1130, 1133 (*SUWA*).) They "are 'major components of the transportation systems in most western states.' " (*SUWA*, *supra*, 147 F.Supp.2d at p. 1133.) "[O]ne need but to raise their eyes, when traveling through the West to see the innumerable roads and trails that lead off, and on, through the public domain, into the wilderness where some prospector has found a stake (or broke his heart) or a homesteader has found the valley of his dreams and laboriously and sometimes at very great expense built a road to conform to the terrain, and which in many instances is the only possible surface access to the property by vehicles required to haul heavy equipment, supplies and machinery." (*United States v. 9,947.71 Acres of Land* (D.Nev. 1963) 220 F.Supp. 328, 331 [R.S. 2477 case].)

Some believe these roads impair modern federal land management interests, and some espouse the view that federal law ought to govern recognition of R.S. 2477 roads. (E.g., Comment, *Revised Statutes 2477 Right-of-Way Settlement Act: Exorcism or Exercise for the Ghost of Land Use Past?* (1996) 5 Dick. J. Envtl. L. & Pol'y 315; but see Hjelle, *Ten Essential Points Concerning R.S. 2477 Rights-of-Way* (1994) 14 J. Energy, Nat. Resources, & Envtl. L. 301, 303-304, 311-312 (Hjelle).)

Although R.S. 2477 is an offer by the federal government, it could be accepted by the public, according to the applicable *state law* governing dedications. (*McRose v. Bottyer* (1889) 81 Cal. 122, 126 [22 P. 393] (*McRose*); *Ball v. Stephens* (1945) 68 Cal.App.2d 843, 846 [158 P.2d 207] (*Ball*); *Streeter v. Stalnaker* (1901) 61 Neb. 205 [85 N.W. 47, 48]; *Lovelace v. Hightower* (1946) 50 N.M. 50, 55-64 [168 P.2d 864, 867-875] (*Lovelace*); *Standage Ventures, Inc. v. State of Arizona* (9th Cir. 1974) 499 F.2d 248, 250; see Bader, *Potential Legal Standards for Resolving the R.S. 2477 Right of Way Crisis* (1994) 11 Pace Envtl. L.Rev. 486, 491, 502-503 (Bader); Annot., Necessity and Sufficiency of Acceptance of Grant of Right of Way over Public Land for Public Highway (1917) 1917A L.R.A. 355, 359.) The federal government has acknowledged as much in administering R.S. 2477. (See *In re Barnes* (1999) 151 Interior Dec. 128, 132-133 [1999 WL 33220771 (D.O.I.)] [citing, inter alia, *Ball, supra*, 68 Cal.App.2d 843]; *In re Meeds* (1974) 83 Interior Dec. 315, 317-318, 320-322 [1974 WL 25306 (D.O.I.)].)

A major difficulty is the 1866 act had no recordation requirements, and the federal government never imposed one. (See Hjelle, *supra*, 14 J. Energy, Nat. Resources, & Envtl. L. at pp. 303-304, 320; Urquhart, Protecting Access to Federal Lands (2001) 15 Nat. Resources & Env't 192, 193.) Therefore it may be a difficult factual issue whether a road was created before the land was patented. (Bader, *supra*, 11 Pace Envtl. L.Rev. at pp. 487-488 [many R.S. 2477 roads "forgotten by the state and federal government, but never formally abandoned"].)

However, when federal land was granted (patented), the grant was subject to any interests the United States had already conveyed, including any R.S. 2477 highways, recorded or not. (*Bequette v. Patterson* (1894) 104 Cal. 282, 284-285 [37 P. 917]; *McRose, supra*, 81 Cal. at p. 126; *Murray v. City of Butte* (1887) 7 Mont. 61 [14 P. 656, 657]; Lindley, *supra*, §§ 530-531, pp. 880-881; Ricketts, American Mining Law (4th ed. 1943) § 626, p. 368.)

■ Sometimes proof of an R.S. 2477 road is by proof of long public usage, the same type of evidence used to show a road by *prescription*. (Cf. *Hartley v. Vermillion* (1903) 141 Cal. 339, 348-349 [74 P. 987].) But perfection of a public right-of-way under R.S. 2477 does not depend on adverse use of the land as a road, as in cases involving prescriptive rights-of-way. (*Hatch Bros. Co. v. Black* (1917) 25 Wyo. 109 [165 P. 518, 519-520].) Acceptance can be by approval of a governmental entity, or "until a highway is established in a manner recognized by the law of the state." (*United States v. Pruden* (10th Cir. 1949) 172 F.2d 503, 505; see *Schwerdtle v. County of Placer* (1895) 108 Cal. 589, 591-592 [41 P. 448] [use by public

without objections for many years] (*Schwerdtle*).) Depending on state law, public use need not be for a specific length of time (*Lovelace, supra,* 50 N.M. at pp. 54-64 [168 P.2d at pp. 866-873]) nor are formal proceedings needed. (*Ball, supra,* 68 Cal.App.2d at pp. 846-847; *Martino v. Bd. of Commrs.* (1961) 146 Colo. 143, 148-149 [360 P.2d 804, 807] [" 'User is the requisite element, and it may be by any who have occasion to travel over public lands"]; Morrison, Mining Rights (16th ed. 1936) p. 240; Ricketts, *supra,* § 627b, p. 369.) Congress, in enacting R.S. 2477, was presumed to know that "There is no particular form or ceremony necessary in the dedication of land to public use. All that is required is the assent of the owner . . . and the fact of its being used for the public purposes intended[.]" (*Cincinnati v. White's Lessee* (1832) 31 U.S. 431, 440 [8 L.Ed. 452, 457] (*Cincinnati*).)

■ In California, "Dedication of land to a public use is simply setting it apart or devoting it to that use. To constitute a dedication at common law no particular formality of either word or act is required." (*Smith v. City of San Luis Obispo* (1892) 95 Cal. 463, 466 [30 P. 591].) "[U]se of the street by the public for a reasonable length of time, where the intention of the owner to dedicate is clearly shown, is sufficient, without any specific action by the municipal authorities, either by resolution or by repairs or improvements." (*Id.* at p. 470.)

"Many cases hold that an offer to dedicate land may be inferred from the owner's long acquiescence in a public use of the property under circumstances which negative the idea that the use was under a license." (*Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235, 240 [267 P.2d 10] (*Union Transp.*).) But acceptance by public use alone could impose an unwanted public liability. The California Supreme Court "concluded that while public use alone might constitute acceptance for purposes of the public's right to use the road, acceptance by public use alone would not suffice where the issue was one of governmental liability for failure to maintain. [The court also] held that, although 'some official action consistent with an acceptance of the dedication' was required, no 'formal act of acceptance' was necessary. [*Union Transp.*], *supra,* 42 Cal.2d at p. 244.) 'Any action of the responsible public officials showing an assumption of control over the road' was sufficient recognition that the road was a public highway. (*Ibid.*) Evidence that [a] superintendent of roads sent road equipment to that portion of the road with instructions to make repairs on it supported the inference of implied acceptance by the county." (*Re-Open Rambla, Inc. v. Board of Supervisors* (1995) 39 Cal.App.4th 1499, 1506-1507 [46 Cal.Rptr.2d 822]) ■ In 1955, the Legislature abrogated part of *Union Transp., supra,* 42 Cal.2d 235, by amending Streets and Highways

Code section 941 to provide that no road would become a highway by public use. (*Re-Open Rambla, Inc. v. Board of Supervisors, supra,* 39 Cal.App.4th at p. 1507.) That did not invalidate existing roads.

■ *Implied* dedications are of two kinds. As indicated, one involves very long use. (*Hartley v. Vermillion, supra,* 141 Cal. at pp. 348-349; see *Tilton v. Inhabitants of Wenham* (1899) 172 Mass. 407, 409 [52 N.E. 514, 515] (per Holmes, J.).) But "If a dedication is sought to be established by a use which has continued a short time—not long enough to perfect the rights of the public under the rules of prescription—then truly the actual consent or acquiescence of the owner is an essential matter, since without it no dedication could be proved and none would be presumed; *but where this actual consent and acquiescence can be proved, then the length of time of the public use ceases to be of any importance, because . . . the rights of the public have immediately vested.*" (*Schwerdtle, supra,* 108 Cal. at p. 593, italics added, quoted approvingly in *Union Transp., supra,* 42 Cal.2d at pp. 240-241.)

■ Via R.S. 2477, Congress made an *actual* offer of dedication (*Lovelace, supra,* 50 N.M. 50, 55 [168 P.2d 864, 867]) albeit an amorphous one, because the specific lands are not stated. It is the *acceptance* which, when not done by formal governmental action, may be implied by the conduct of members of the public.

Here, an R.S. 2477 road is shown by public use after 1866, evidencing acceptance of the statutory dedication. Further, public repair and depiction of the public road on official maps (as shown in this case) are both traditional signs of acceptance of a dedication. (E.g., *City of Point Pleasant v. Caldwell* (1920) 87 W.Va. 277 [104 S.E. 610, 611-612]; *City of Rock Island v. Starkey* (1901) 189 Ill. 515, 524 [59 N.E. 971, 974]; *Steele v. Sullivan* (1881) 70 Ala. 589; 1 Elliott, Law of Roads and Streets (4th ed. 1926) §§ 165-169, pp. 189-198 (Elliott).)

Western asserts map markings cannot *create* a road. But such markings on official maps can provide evidence that a public road existed. (Evid. Code, § 1341; *Gray v. Magee* (1933) 133 Cal.App. 653, 658, 661 [24 P.2d 948]; cf. *Whelan v. Boyd* (1892) 93 Cal. 500, 501 [29 P. 69] [maps not conclusive].)

### C. *No unlawful taking of property was proven.*

■ Western asserts recognition of a public road herein constitutes an unlawful taking of property. We disagree. When the road was designated as a public road in 1855 (if not sooner), the land under it was public. In 1866, Congress legitimated the road as far as federal law was concerned, except arguably as to a few private parcels, discussed *post.*

1. *The 1855 Board order under state law.*

Western does not mention the 1850 Court of Sessions order that the trial court found likely established the road under state law. But because the County does not rely on that act, we begin with more recent events.

On April 28, 1855, Governor John Bigler approved a bill permitting the Board to order roads to "be considered as public highways which are now used as such," (Stats. 1855, ch. 152, § 1, p. 192) and California statutes then became effective immediately. (See *People v. Clark* (1851) 1 Cal. 406, 408.) In May 1855, the Board ordered that "all Roads now traveled by wagons and pack mules within the Limits of Yuba County be and the same are hereby declared Public Highways." Wagon roads were the types of roads in existence at the time of the gold rush. (Latta, *supra*, pp. 832-834, 840.) A law declaring all roads to be public roads could establish an R.S. 2477 road. (*Schwerdtle, supra*, 108 Cal. at pp. 591-592.)

Western asserts the 1855 order was unconstitutional, relying on *Harding v. Jasper* (1860) 14 Cal. 642, 646-647 (*Harding*), which stated: "This order was given in evidence against the plaintiffs' objection. It is very true, as the appellant's counsel argues, that so compendious a process of appropriating the land of others to public purposes, as might be implied from the general terms of this order, may not be conformable to the constitution and law; and, therefore, that this order, considered as a basis of title in the public to this land may not be valid. But still, the evidence was not, perhaps, objectionable for all purposes. It might, in connection with other proof, be admissible to show a control on the part of the county of this road, and a knowledge of this control over it, as a public highway, on the part of the owners, and thus furnish a circumstance, as will be more fully explained hereafter, from which a dedication may be inferred."

Western assumes the 1855 order was held unconstitutional. Not so. *Harding, supra,* 14 Cal. 642 held the ordinance could not of itself show *private* interests in land had been taken. The statement of decision recites it was "undisputed that at the time of the 1855 Ordinance . . . none of the land over which the Marysville-Nevada Road ran had been patented or granted by the Federal or State government to private landowners."

Western claims "The [trial court] justified its action by presuming that in 1855 there were no known private landowners in the Goldfields. [Citation.] In other words, the trial court resurrected an unconstitutional Order by assuming no private landowners' rights were violated." The trial court was correct to assume there were no private landowners in 1855. *Western* introduced exhibit Y, the detailed chains of title to the parcels in question, and

none show any patents before 1862. Western did not introduce any evidence of any Mexican land grants in the area, nor that any such grants had been confirmed by the special tribunal set up to pass on the validity thereof, pursuant to the Treaty of Guadelupe Hidalgo. (See *Teschemacher v. Thompson* (1861) 18 Cal. 11.) So far as the record shows, the patents in exhibit Y represented original grants as to each parcel. On this evidence, the trial court correctly concluded there were no private landowners in 1855.

Western claims the 1855 order lacked notice provisions, therefore the trial court could not *"know* whether someone would have come forward to protect a proprietary interest along the road route in 1855." Again, it was Western which had the burden of proof to quiet title. (*Ernie, supra*, 51 Cal.2d at p. 706.) Western's failure to show there were any private landowners in 1855, and indeed, exhibit Y's effective *disproof* of any such landowners, undermines Western's claim.

### 2. *The government parcels in 1866.*

All of the parcels belonged to the federal or state government at the time the road came into being, and most were unpatented when the federal mining act took effect. To the extent the lands were unpatented at that time, no taking of private property occurred. (See *Hobart v. Ford* (1870) 6 Nev. 77, 82 [construing section of 1866 act granting ditch rights based on user according to local customs].)

### 3. *The private parcels in 1866.*

There are four parcels (Parcel Nos. 4, 6-8) which were patented at least in part before 1866. All of them came into the hands of Sam Brannan, and thence (all by 1879) to James O'Brien of "O'Brien's Corner," referred to at trial, which was about three miles from Hammonton. It is not claimed the historic road ran over all of these parcels. The documents show people often held land before patents were issued, and sometimes agreed to transfer the land before patenting.

First, in 1864 California patented to Brannan parts of Parcel Nos. 4 and 6. Through Daniel Walters and George Smith (and others) the property went to James O'Brien. Second, in 1861 and 1864, the United States patented parts of Parcel No. 6, which eventually were held by Brannan, thence to Walters and Smith, and thence to O'Brien. Third, California patented Parcel No. 7 partly before 1866, but this parcel did not contain the road. Brannan sold it to Walters and Smith, and thence it went ultimately to O'Brien. Fourth, separate parts of Parcel No. 8 were patented by the United States to George

Martin and Daniel Whitney, but by transfers in 1862, the parcels went to Brannan, thence to Walters and Smith and to O'Brien. More of Parcel No. 8 was patented by California, transferred to Brannan in 1862, thence to Walters and Smith and thence to O'Brien.

There is no evidence of any protest regarding the parcels patented before 1866, or to the 1855 ordinance declaring the existing roads to be public. (Cf. *Steele v. Sullivan, supra,* 70 Ala. at p. 594 [intent to dedicate in long-use case may be rebutted "by any word of protest, or act of remonstrance, on the part of the owner, by which he denies or forbids the right of use to the public"]; see *Cincinnati, supra,* 31 U.S. at p. 440 [8 L.Ed. at p. 457] ["from the mere use of the land, as public land . . . the assent of the owner may be presumed. . . . [C]ontinued assent will be presumed, until a dissent is shown; and this should be satisfactorily established by the party claiming against the dedication"].)

The common owners (Brannan to O'Brien) bracketing the 1866 law had every commercial and practical incentive to keep the existing public road open and there is no evidence of any complaint. Exhibit Y shows James K. O'Brien was the successor of James O'Brien. (See also *Mammoth Gold Dredging Co. v. Forbes* (1940) 39 Cal.App.2d 739, 749 [104 P.2d 131].) As stated in the facts, James K. O'Brien acknowledged in federal court (circa 1918-1925) that the road was public. The pre-1866 patentees took their property burdened by a public road and thereafter acquiesced in the continued use of the road. Such long acquiescence defeats any takings theory they may have raised (e.g., that the patents undermined a trespassory road). No taking is shown as to these parcels. "Laws establishing a presumption of donation from long user are not laws for taking property." (Angell, Law of Highways (3d ed. 1886) Dedication, § 131, p. 145, fn. 1 (Angell), citing *Bumpus v. Miller* (1856) 4 Mich. 159.)

III. *Estoppel does not defeat the road.*

During the *King* lawsuits arising out of the trespassing arrests in the Goldfields, the County denied the arrests took place on a County road. The County changed its position, and is here represented by the same counsel who represented the arrestees, on the very issue of the existence of the road. Western asserts the County should be estopped to allege a public road. We disagree.

"[N]either the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public." (*County of San*

*Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 826 [186 P.2d 124, 175 A.L.R. 747] (*County of San Diego*), quoted by *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 316 [96 Cal.Rptr.2d 747, 1 P.3d 63].) The Legislature now has procedures governing how a road may be vacated and a public body cannot circumvent those procedures by conduct that might otherwise amount to an estoppel. (*County of San Diego, supra,* 30 Cal.2d at pp. 822-830.) Government estoppel is reserved for " 'exceptional cases,' or situations where 'justice and right require it.' " (*Id.* at p. 825.)

Western largely relies on cases from this court that have used estoppel to achieve abandonment of a right of way. But what is common in those cases but absent here is that the lands were not needed and the government had intended to abandon them, generally inducing reliance by the private party.

In *People ex rel. Department of Public Works v. Volz* (1972) 25 Cal.App.3d 480 [102 Cal.Rptr. 107], the state condemned land and urged the land should be devalued because of a recorded 1910 street easement through it. A parallel easement existed nearby, on which Riverside Boulevard was built in 1940. This court upheld the exclusion of evidence of the 1910 easement, concluding the easement was unnecessary and the property owner had relied on the government to relocate the easement, rather than retain two easements, one of which was useless to the government but burdensome to the property owner. (*Id.* at pp. 489-490.)

In *Palo Alto Inv. Co. v. County of Placer* (1969) 269 Cal.App.2d 363 [74 Cal.Rptr. 831], the Rubicon Road was going to be rerouted through a subdivision and the owners agreed to improve this new part, with the understanding that the old part would belong to them. After the improvements were made, a highway project was cancelled and Placer County argued it owned the old part. We held the old part was not needed, the owners had relied on the government, and public policy was not impaired by application of an estoppel to achieve abandonment. (*Id.* at pp. 367-369.)

In *Smith v. Ricker* (1964) 226 Cal.App.2d 96 [37 Cal.Rptr. 769], a suit between private property owners, a critical issue was whether a highway formerly running between the properties had been abandoned. The state had stopped maintaining the road in 1932 when a new state highway was built nearby, and a 1937 flood destroyed much of the road. (*Id.* at p. 97.) One party urged the lack of abandonment proceedings meant the remnants of the road remained public. There was a resolution approving the new route, but not explicitly abandoning the old. (*Id.* at p. 99.) We concluded that because

the public never owned the land, but merely had a right-of-way, a formal abandonment was not required. As we summarized at pages 99-100: "Whether relocation of a highway and nonuser of its former site constitute an abandonment of the public interest by implication depends upon two factors: (1) the character of the interest originally acquired by the public, and (2) compliance with statutory formalities. *In the absence of statute a proprietary interest in the highway site, acquired by deed or dedication, may be lost only through express abandonment*; but a public interest acquired by occupancy and use, without a formal grant, may be extinguished by nonuser, relocation or other evidence of an intent to abandon. [Citations.] If statutes provide a method for abandonment or vacation of roads, that method is exclusive." (Italics added.)

Our prior cases do not aid Western. Here, there was an actual dedication grant by the United States, the County never relocated the road and Western offers no alternate route.

Further, Western did not *rely* on the County's statement in the *King* litigation. In a more recent case involving a claim of government estoppel we emphasized: " 'Chief among the principles necessary to sustain the person claiming estoppel is damage to that person through being misled by actions or omissions' " against whom the estoppel is invoked. (*California Tahoe Regional Planning Agency v. Day & Night Electric, Inc.* (1985) 163 Cal.App.3d 898, 903 [210 Cal.Rptr. 48].) Western cites another case that did not involve alternate routes, but which rests on the element of reliance. In *City of Los Angeles v. Cohn* (1894) 101 Cal. 373 [35 P. 1002] (*Cohn*), a landowner began in 1871 to build a structure arguably encroaching on public land. The city attorney investigated the matter and reported to the city council that the city had no claim to the property, and this opinion was entered in the minutes. The owner, relying on this official finding, completed the building. Twenty years later, the city claimed the building encroached on a city street, but the California Supreme Court concluded the city was estopped. (*Id.* at pp. 374-375.)

Here, the County may have been ill-informed about its rights. Even if the County denied the existence of a public road as a litigation tactic in the *King* case, such tactic did not mislead Western: At most it harmed the interests of the arrestees. As late as the 1960's, Western's predecessor acknowledged the road was public. Western and its predecessors freely dredged the road, and there is no evidence Western relied on the County's conduct in the *King* litigation in any way.

Application of an estoppel here, where reliance is not shown and no alternate route is available, would defeat the public policy reflected by

statutes setting forth specific procedures for the abandonment of roads. That is forbidden. (*County of San Diego, supra*, 30 Cal.2d at p. 826.)

### IV. *Western has not proved the road was abandoned.*

██ Western heads an argument that "Even if the public had acquired some prescriptive rights to the Marysville-Nevada Road, they were lost as a result of a lengthy period of disuse from approximately 1877 to 1905." We disagree.

As we have demonstrated, the road arose spontaneously by the efforts of miners and others, and was allowed to exist by virtue of a de facto policy permitting trespassing over federal lands. The road was declared to be a public road as early as 1855, under state law. Congress ratified existing conditions in California by passing the 1866 act, which among other things offered the road (to the extent still over unpatented federal lands) for dedication, which was accepted when the next stagecoach passed over the road. (*U.S. v. Lyndell N.* (9th Cir. 1997) 124 F.3d 1170, 1172 [federal laws become operative when passed].) As to those portions of the road that ran over the Brannan-O'Brien parcels we have discussed, those private landowners impliedly dedicated the land for continued use of the road (which had run over their lands since long before their ownership). Therefore, Western's characterization of the public's right as purely prescriptive is not accurate. (See *Heath v. Parker* (Colo.Ct.App. 2000) 30 P.3d 746, 749 ["because the Road was established through public use [under R.S. 2477], we need not address the abandonment of a road created through public prescriptive use"] (*Heath*).)

Even if the road existed solely by prescription, Western's argument fails. Western relies on a statute (former Pol. Code, § 2620) which stated a road "not worked or used for the period of five years ceased to be a highway for any purpose whatever." This statute was part of the original Political Code, effective in 1873. (Code commrs., Ann. Pol. Code (1st ed. 1872, Haymond & Burch, commrs. annotators) p. 6.) Western makes a similar (though less clearcut) claim regarding a statute applicable after 1884. (Former Pol. Code, § 2621; Stats. 1883, ch. 10, § 1, p. 6.) Western asserts the failure of proof of road activity between 1877 and 1905 shows the old road was abandoned by desuetude. (See *McRose, supra*, 81 Cal. at pp. 125-126.)

We accept, arguendo, Western's legal theory, but only for the purposes of this case as to the 1883 law.

Western's argument founders on the facts and burden of proof. The general rule is: " 'Once a highway, always a highway.' " (2 Elliott, *supra*,

§ 1172, p. 1668.) Therefore, the burden of proof is on the party contending a highway no longer exists. (*Id.*, § 1173, p. 1669; *Heath, supra,* 30 P.3d at p. 749.) Western paints certain evidence in its favor, but the trial court was not obliged to view the evidence favorably to Western, nor are we. Moreover, it appears this contention is factually hinged to the claim that the original road was destroyed and no other route can be substituted for it, which we address elsewhere. Western did not carry its burden to prove the road was not used between 1877 and 1905 for a period of five years, or for any period. True, the County did not introduce proof of activity covering every lustrum from 1877 to 1905, but it proved the road was used before and after that period. The trier of fact could infer the road was used in the interim. "A thing continues to exist as long as is usual with things of that nature." (Civ. Code, § 3547; see *Hohenshell v. South Riverside etc. Co.* (1900) 128 Cal. 627, 631 [61 P. 371] [title presumed to remain the same].)

Moreover, there is no other way to access the lands once served by the road. "[T]he availability of substitute access provided by another road has usually been a relevant, if not critical, factor in the determination of an intent to abandon." (*Heath, supra,* 30 P.3d at p. 750; see also *id.* at p. 751 ["even occasional use of a public road for access purposes, in the absence of an alternative road, precludes a finding of abandonment"].)

V. *Dismissal of the complaint is not warranted.*

Pointing to part of the statement of decision in which the trial court alternatively concluded that the *Henwood* action barred Western's complaint, Western argues the trial court should have dismissed its complaint. Not so.

A quiet title action seeks to declare the rights of the parties in realty. A trial court should ordinarily resolve such dispute. This accords with the rule that a trial court should not dismiss a regular declaratory relief action when the plaintiff loses, but instead should issue a judgment setting forth the declaration of rights and thus ending the controversy. (See *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 729 [146 P.2d 673, 151 A.L.R. 1062]; *Haley v. L. A. County Flood Control Dist.* (1959) 172 Cal.App.2d 285, 292-294 [342 P.2d 476].) As stated in a case involving Western's predecessors, " 'The object of the action is to finally settle and determine, as between the parties, all conflicting claims to the property in controversy, and to decree to each such interest or estate therein as he may be entitled to.' " (*Yuba Invest. Co. v. Yuba Consol. Gold Fields* (1926) 199 Cal. 203, 209 [248 P. 672]; see *Gazos Creek Mill etc. Co. v. Coburn* (1908) 8 Cal.App. 150, 153 [96 P. 359] ["all parties were before the court with their grievances"].)

The complaint sought to enjoin the County "forever" from asserting rights in the road and the amended answer asserted the road had been in controversy "for at least" 100 years. The matter was ripe—if not overripe—for decision.

## VI. *Clarification of the remedy is required.*

 The cause must be remanded to clarify the exact right of the public in Western's land. The road will not be exactly as shown on the 1861 Yuba County map. This does not deprive the People of the right to a road, particularly since most, if not all, of the cause was due to Western and its predecessors.

### A. *The metes and bounds must be determined.*

Western points out that the judgment does not specify the metes and bounds of the roadway over its entire course. In a case involving the width of an old road, we remanded for a determination of the exact contours of the road. (*County of Colusa v. Charter* (1989) 208 Cal.App.3d 256, 266-268 [256 Cal.Rptr. 45]; see *Sprague v. Stead* (1914) 56 Colo. 358, 543 [139 P. 544, 546] (*Sprague*) [remanding for that purpose in R.S. 2477 case]; see also *Leverone v. Weakley* (1909) 155 Cal. 395, 398 [101 P. 304]; *Tucker v. Watkins* (1967) 251 Cal.App.2d 327, 332 [59 Cal.Rptr. 453] ["all that is shown . . . are the two termini of the old road," held, insufficient].)

The County asserts Western cannot complain of the lack of description because Western and its predecessors dug up the road. But: "Every . . . judgment which constitutes evidence of title to a right of way . . . in relation to county highways shall particularly describe the lands included in such right of way" and such judgments must be recorded so the public knows its rights. (Sts. & Hy. Code, §§ 947, 948.)

The County's reliance at oral argument on *Guerra v. Packard* (1965) 236 Cal.App.2d 272 [46 Cal.Rptr. 25] is unavailing. That case involved a private easement, not a public highway governed by Streets and Highways Code section 947, and the description included width, reference to existing named routes, "physical monuments, compass directions and longitudinal and latitudinal designations" (*Guerra, supra,* 236 Cal.App.2d at pp. 296-297), none of which are present here. Nor is *Hitchcock v. Lovelace* (1941) 47 Cal.App.2d 818 [119 P.2d 151] persuasive. It, too, involved private parties, and the description referenced existing named roads, (*id.* at pp. 826-827) whereas here the contours of the public road have changed without recordation. The judgment is sufficient to alert *Western* to the public's right to the road, but is not sufficient to comply with the statutes.

The trial court substituted the existing "haul road" in places where today's road deviates from the historic road. On remand the trial court must ascertain the exact route and width of that road. If the parties are unable to agree on an exact description, the trial court may conduct such proceedings (e.g., appointment of a special master) as are necessary to define the public road now running through the Goldfields. Such proceedings must not delay the People's right to use their road upon finality of this decision.

Western argues "reasonable accuracy" in the description of the road is inadequate, and no road can ever lawfully be declared. We agree with the Attorney General's view: "[I]t would be unsound policy to destroy the public's right to traverse and gain access to the expansive Yuba Goldfields simply because Western and its predecessors destroyed or relocated portions of the original physical location of the public road[.]"

### B. *The County has no fee interest in the Goldfields.*

The judgment partly states: "Because Plaintiff has failed to carry its burden of proof, . . . judgment as to [listed] parcels is hereby entered for the defendant County, along with a declaration of a public easement or right of way for a County road running in and through those parcels." Western asserts this grants the County a fee interest. Entering judgment for the County on Western's complaint is not the same as *quieting title* in the County. Moreover, the judgment describes the interest as "a public easement or right of way for a County road." This is not a fee interest.

### C. *The replacement route of the road is proper.*

The exact course of the road has changed in certain places, due in large part to the actions of Western and its predecessors. Western asserts the trial court was mistaken to treat "the haul road built in the 1980s by Western and a 1940s-vintage road to . . . . Hammonton" as the functional substitute for the Marysville-Nevada Road, asserting a taking has occurred.

Western's argument relies heavily on the new trial exhibits, which we disregard. Western also makes factual points that are refuted by the record, including the claims that there is "no evidence" Western's predecessors destroyed the old road and "no evidence" the later roads were intended as relocations for the old road. From the facts found by the trial court, and the reasonable inferences flowing therefrom (see *Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370 [210 P.2d 757]), Western's factual claims lack merit.

Western's legal claims fare no better. A United States Supreme Court case discusses the common law rule regarding deviations in highways: "The

original road was formed by the passage of wagons, etc., over the natural soil, and we know, as a matter of ordinary observation, that in such cases the line of travel is subject to occasional deviations owing to changes brought about by storms, temporary obstructions, and other causes. But, so far as the specific parcels of land here in dispute are concerned, we find nothing in the record to compel the conclusion that any departure from the line of the original highway was of such extent as to destroy the identity of the road as originally laid out and used." (*Central P. R. Co. v. Alameda County* (1932) 284 U.S. 463, 467 [52 S.Ct. 225, 226-227, 76 L.Ed. 402, 405] (*Central Pacific*).)

■ At common law, "there can be no loss of the public right by mere nonuser. A highway once established must always remain such until changed or discontinued by process of law." (Angell, *supra*, § 321, p. 430; see 2 Elliott, *supra*, §§ 1172-1174, pp. 1668-1671; see also Civ. Code, § 3547.) Where the claim is the road has been abandoned, the burden is on the party attacking the road to demonstrate that deviations are so profound as to constitute abandonment. (*Central Pacific, supra,* 284 U.S. at pp. 467-468 [52 S.Ct. at pp. 226-227, 76 L.Ed. at p. 405]; see *Ward v. City of Monrovia* (1940) 16 Cal.2d 815, 821-822 [108 P.2d 425] [prescriptive easement case, "the change must be material either in the nature of the extent of the servitude imposed"].) No fixed degree of change is dispositive: "[T]he distance to which a roadway may be changed without destroying an easement will be determined somewhat by the character of the land over which it passes, together with the value, improvements, and purposes to which the land is adapted." (*Matthiessen v. Grand* (1928) 92 Cal.App. 504, 510 [268 P. 675] [private easement case]; cf. *Dooling v. Dabel* (1947) 82 Cal.App.2d 417, 424 [186 P.2d 183].) "[T]he obstruction of an old way and the opening of a new by the landowner, or the substitution of a new highway for an old, when accepted by the public has been held a dedication of the new highway." (1 Elliott, *supra*, § 181, p. 218; see *id.*, § 187, pp. 226-227.) Where the termini remain the same, and a party over whose land a roadway changes voices no objection (or changes the route), the new route succeeds to the status of the old. (*Larned v. Larned* (1846) 52 Mass. 421; Angell, *supra*, § 143, pp. 159-160; see *Small v. Binford* (1908) 41 Ind.App. 440 [84 N.E. 507, 509-510] ["It is sufficient if the line of travel remains substantially unchanged, although at times it may deviate to avoid bad roads or obstructions."].)

Cases construing R.S. 2477 have followed the common law rule regarding changes in the precise line of the road. (*Sprague, supra,* 56 Colo. at p. 342 [139 P. at p. 545] ["reasonably definite and certain line"]; *Streeter v. Stalnaker, supra,* 61 Neb. 205 [81 N.W. at p. 47].)

■■■ Moreover, a party who "actually assisted in the variation of the road" cannot complain about such variation. (*Bumpus v. Miller, supra,* 4 Mich. at p. 164; see Civ. Code, § 3517 [No one can take advantage of his own wrong.].)

*Wilkenson, supra,* 634 F.Supp. 1265, addressed claims by landowners to the right of free passage across the Colorado National Monument, based on an alleged R.S. 2477 road. District Judge Richard Matsch stated: "The Glade Park spur was built by farmers and ranchers in 1921. There is no legal basis for asserting that this particular segment of the road constitutes a right of way acquired under [R.S. 2477] because the construction was after the establishment of the Monument [in 1911]. There is evidence, however, that people were traversing the top of the mesa and going into Glade Park by a wagon road by 1912. *The fair inference is that the road at the top must have connected with some road coming up from the bottom before the Monument was established.*" (634 F.Supp. at p. 1273, italics added.)

This reflects the commonsense idea that a road's importance may lie in the points it connects. The "fair inference" is the road connects points, completing a throughway, even if the intermediate route changes. (See *Wilkenson, supra,* 634 F.Supp. at pp. 1275-1276, quoting *Central Pacific, supra,* 284 U.S. 463 [52 S.Ct. 225, 76 L.Ed. 402].) Professor Bader lists as typical those R.S. 2477 roads "used to connect two or more distinct locations. Examples include routes which are the primary means between towns or which link two transportation arteries, or which once served as stage lines." (Bader, *supra,* 11 Pace Envtl. L.Rev. at pp. 505-506, fns. omitted.) Here, the County wants the right to go through Western's lands, not to recreate the old route.

We note Western did not prove it erected anything of value at any particular location of the new route in reliance on the County's conduct. (Cf. *Cohn, supra,* 101 Cal. at pp. 374-375.)

## VII. *Western was not deprived of a fair trial.*

The trial court ordered the parties to file posttrial briefs and directed both parties to file proposed statements of decision by September 21, 2000. The parties then stipulated that the County's proposed statement of decision would be due a week later to give the County "an opportunity to review [Western's] Reply Brief After Trial in order to prepare findings and conclusions as to all matters at issue." The court accepted this stipulation. Both parties lodged proposed statements of decision.

On November 3, 2000, the trial court ordered the County to make a number of changes (by page and line) to its proposed statement of decision.

On November 7, 2000, Western requested a statement of decision and attached proposals, in part stating: "Although the Court has not followed the procedures set forth in Rule 232 . . . relative to a tentative decision, the 'Order' which adopted the essential elements of the [County's] proposed Statement of Decision previously filed will be considered the tentative decision of the Court as is required by said Rule."

On November 14, 2000, the court entered an order treating Western's filing as raising objections to the proposed decision, lest the filing be "superfluous."

On November 20, 2000, the trial court filed its statement of decision and judgment.

On December 1, 2000, Western filed further objections to the statement of decision. Later various papers were filed regarding a new trial motion and costs. The new trial motion was denied and Western timely filed a timely notice of appeal from the judgment of November 20, 2000.

 Western asserts the trial court deprived it of a fair trial, because the trial court: (1) failed to announce a tentative decision or allow Western to object; and (2) should have prepared its own statement of decision.

We disagree with Western's claims of reversible error.

1. The court ordered each party to present proposed statements of decision with their posttrial briefs. When the court directed the County to make specific changes to its proposal, that became the court's tentative decision, *and Western treated it as such in the trial court*. Then, the court treated Western's request for a statement of decision (filed after the tentative decision had been announced) as containing objections to the tentative decision. As the trial court indicated, doing otherwise would have made the filing superfluous. Given the stipulation of the parties, and Western's acknowledgement that the County's proposal when adopted by the trial court equated to a tentative decision, Western was not deprived of a fair trial. Moreover, the place for Western to object to the trial court's procedure was in the trial court. (See *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 205 [29 Cal.Rptr.2d 128].)

2. The trial court had no duty to prepare its own statement of decision. The trial court did not "rubber-stamp" the County's proposal, as Western states, instead the trial court *agreed* with it (as amended). The trial was free to make (and did make) any changes deemed necessary. Trial courts often

direct one party to prepare a statement of decision. (See *Whittington v. McKinney* (1991) 234 Cal.App.3d 123, 129, fn. 5 [285 Cal.Rptr. 586] ["preparation of a statement of decision should place no extra burden on the trial courts. A party may be, and often should be, required to prepare the statement."]; *Miramar Hotel Corp. v. Frank B. Hall & Co.* (1985) 163 Cal.App.3d 1126, 1128-1129 [210 Cal.Rptr. 114]; Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2000) ¶¶ 16:156 to 16:157, pp. 16:31 to 16: 32 (rev. #1 2001).)

We conclude Western has not demonstrated that it was deprived of a fair trial by the trial court's procedures culminating in the issuance of the statement of decision.

Even if Western had demonstrated error in the posttrial proceedings, we would not reverse. Western had the opportunity to set forth its view of the case, factually and legally, and object to the County's assertions. The trial court issued a statement of decision "explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial." (Code Civ. Proc., § 632.) Western fails to explain how the procedure employed caused a miscarriage of justice requiring reversal of the judgment for procedural error. (See Cal. Const., art. VI, § 13, Code Civ. Proc., § 475; *Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601 [191 P.2d 432]; *Santina v. General Petroleum Corp.* (1940) 41 Cal.App.2d 74, 77 [106 P.2d 60] ["Where any error is relied on for a reversal it is not sufficient for appellant to point to the error and rest there."].)

## DISPOSITION

The cause is remanded with directions to the trial court to conduct further proceedings as necessary to specify the metes and bounds of the public road, consistent with this opinion. (Sts. & Hy. Code, § 947.) In all other respects, the judgment is affirmed. Western shall pay the County's costs of this appeal.

Blease, Acting P. J., and Sims, J., concurred.

A petition for rehearing was denied on August 16, 2002, and the following opinion was then rendered:

MORRISON, J.—The public acquired its present right to use Western's haul road because of the movement of the road by Western and its predecessors and therefore it is the road currently in existence which belongs to the public. In its rehearing petition Western objects that it does not own

several discrete portions of the existing road and they were not part of this quiet title action. Western lacks standing to object on behalf of other property owners. If those owners (including the United States) are able to block access to portions of the haul road, Western has the obligation to provide an adequate route through its lands to those portions of the haul road which it does own. This is consistent with the historic movement of the road, as stated in our opinion: Regardless of dredging and so forth, a public access road was always to be provided by Western's predecessors. Upon finality of our decision, Western (or its subsidiaries or agents) cannot block the public from the road.

However, the *County* has the right to set regulations about the use of and access to the road, just as it has the right to regulate the use of other County roads. Nothing in our opinion should be read to authorize an anarchic rush across Western's active mining operations, clogging of the road and so forth.

Contrary to Western's claim in the rehearing petition, the County will not bear the cost of any surveys which may be required. The cost of a survey by court-appointed expert (in the event the parties cannot agree on the route) will become a cost of suit for which the County, as the prevailing party, may seek recovery in an appropriate cost bill. (Code Civ. Proc., §§ 1032, 1033.5, subd. (a)(8); see *People v. Superior Court (Laff)* (2001) 25 Cal.4th 703, 737-738 [107 Cal.Rptr.2d 323, 23 P.3d 563].) Moreover, it would be inequitable to require the County to pay for Western's decision, as a matter of Western's business convenience, to move the County road. There is no hint in the evidence before the trial court that the County ever had to pay a dime when Western's predecessors dredged up and rerouted the road and the inference is to the contrary, that Western's predecessors had the duty to rebuild the road when it was damaged or moved. The fact that the survey may be expensive because of the passage of time is wholly the fault of Western, which has illegally gated the road for many years, depriving the public of lawful access.

Western's request for a postopinion settlement conference is denied.

Sims, Acting P. J., concurred.

A petition for a rehearing was denied August 16, 2002, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 16, 2002.